09CV2312
JUDGE GUZMAN
MAGISTRATE JUDGE COX
AO

# EXHIBIT A

 CT Corporation

**Service of Process Transmittal**
03/17/2009
CT Log Number 514588188

TO: Kelli Cubeta
Billing Concepts, Inc.
7411 John Smith Dr., Suite 200
San Antonio, TX 78229

RE: **Process Served In Delaware**

FOR: Enhanced Services Billing, Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

TITLE OF ACTION: Kiril Gantchev and Margaret Ryan, individually and on behalf of a class of similarly situated individuals, Pltfs. vs. Predicto Mobile, LLC, etc., et al. including Enhanced Billing Services, Inc., etc., Dfts.
*Name discrepancy noted.*

DOCUMENT(S) SERVED: Attachment, Summons, Amended Complaint and Demand

COURT/AGENCY: Cook County Circuit Court, IL
Case # 08CH31842

NATURE OF ACTION: Class action - seeking to stop Defendants unlawful practice of charging telephone consumers for products and services the consumers have not authorized, which has resulted in Defendant unlawfully collecting money from consumers throughout the state of Illinois

ON WHOM PROCESS WAS SERVED: The Corporation Trust Company, Wilmington, DE

DATE AND HOUR OF SERVICE: By Process Server on 03/17/2009 at 12:20

APPEARANCE OR ANSWER DUE: Within 30 days after service of summons, not counting day of service

ATTORNEY(S) / SENDER(S): Myles McGuire
350 North LaSalle Street
Suite 1300
Chicago, IL 60654
312-589-6370

REMARKS: Please note: Even though Defendants lists Enhanced Billing Services, Inc., process server commands service on Enhanced Services Billing, Inc.

ACTION ITEMS: SOP Papers with Transmittal, via Fed Ex 2 Day , 790165138806

SIGNED: The Corporation Trust Company
PER: Scott LaScala
ADDRESS: 1209 Orange Street
Wilmington, DE 19801
TELEPHONE: 302-658-7581

Page 1 of 1 / AS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

Delaware.gov | Text Only        Governor | General Assembly | Courts | Elected Officials I State Agencies

*C T*

WINTER IN DOVER | PHOTO BY MIKE MAHAFFIE

---

## Department of State: Division of Corporations

**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent
Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws
Online
Name Reservation
Entity Search
Status
Validate
Certificate
Customer Service
Survey

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and
Fees
Taxes
Expedited
Services
Service of
Process
Registered Agents
Get Corporate
Status
Submitting a
Request  How to
Form a New
Business Entity
Certifications,
Apostilles &
Authentication of
Documents

Frequently Asked Questions    View Search Results

---

Entity Details

---

### THIS IS NOT A STATEMENT OF GOOD STANDING

| | | |
|---|---|---|
| File Number: | **2387502** | Incorporation Date / Formation Date:   **03/17/1994** (mm/dd/yyyy) |
| Entity Name: | **ENHANCED SERVICES BILLING, INC.** | |
| Entity Kind: | **CORPORATION** | Entity Type:   **GENERAL** |
| Residency: | **DOMESTIC** | State:   **DE** |

### REGISTERED AGENT INFORMATION

Name:      **THE CORPORATION TRUST COMPANY**

Address:      **CORPORATION TRUST CENTER 1209 ORANGE STREET**

City:      **WILMINGTON**      County:   **NEW CASTLE**

State:      **DE**      Postal Code:   **19801**

Phone:      **(302)658-7581**

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ◯ Status ◯ Status,Tax & History Information   [ Submit ]

[ Back to Entity Search ]

To contact a Delaware Online Agent click here.

---

2120 - Served          2121 - Served
2220 - Not Served      2221 - Not Served
2320 - Served By Mail  2321 - Served By Mail
2420 - Served By Publication   2421 - Served By Publication
**SUMMONS**           **ALIAS - SUMMONS**               (8/01/08) CCG N00

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, _____ CHANCERY _____ DIVISION

No. 08 CH 31842

**KIRIL GANTCHEV and MARGARET RYAN**

(Name all parties)

Hon. James R. Epstein

v.

**PREDICTO MOBILE, LLC, et al.**

### SUMMONS

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which i
hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at th
following location:

☑ Richard J. Daley Center, 50 W. Washington, Room _____ 802 _____, Chicago, Illinois 60602

☐ **District 2 - Skokie**      ☐ **District 3 - Rolling Meadows**   ☐ **District 4 - Maywood**
   5600 Old Orchard Rd.           2121 Euclid                          1500 Maybrook Ave.
   Skokie, IL 60077               Rolling Meadows, IL 60008            Maywood, IL 60153

☐ **District 5 - Bridgeview**   ☐ **District 6 - Markham**           ☐ **Child Support**
   10220 S. 76th Ave.             16501 S. Kedzie Pkwy.                28 North Clark St., Room 200
   Bridgeview, IL 60455          Markham, IL 60426                    Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF
REQUESTED IN THE COMPLAINT.**

To the officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement
of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed.
This Summons may not be served later than 30 days after its date.

Atty. No.: 44146                         WITNESS, _____  MAR 0 9 2009

Name: Myles McGuire

Atty. for: Plaintiffs                    _____

Address: 350 North LaSalle Street, Suite 1300          Clerk of Court

City/State/Zip: Chicago, Illinois 60654   Date of service: _____, ____
                                          (To be inserted by officer on copy left with defendant
Telephone: (312) 589-6370                 or other person)

Service by Facsimile Transmission will be accepted at: _____

(Area Code)  (Facsimile Telephone Number)

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| KIRIL GANTCHEV AND MARGARET RYAN, individually and on behalf of a class of similarly situated individuals, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | No. 08 CH 31842 |
| | ) | |
| v. | ) | |
| | ) | |
| PREDICTO MOBILE, LLC, a Delaware limited liability company, NEXTWEB MEDIA, LLC, a Nevada limited liability company, EMAIL DISCOUNTS, LLC, a Nevada limited liability company, OPENMARKET, INC., a Michigan corporation, ENHANCED BILLING SERVICES, INC., a Delaware Corporation, | ) ) ) ) ) ) ) ) | The Hon. J. Epstein |
| | ) | |
| Defendants. | ) | **Jury Trial Demanded** |

## AMENDED[1] CLASS ACTION COMPLAINT

Plaintiffs Kiril Gantchev and Margaret Ryan bring this amended class action complaint

against Defendants NextWeb Media, LLC, its subsidiaries Predicto Mobile, LLC and Email

Discounts, LLC, and aggregators OpenMarket, Inc. and Enhanced Billing Services, Inc., seeking

to stop Defendants' unlawful practice of charging telephone consumers for products and services

the consumers have not authorized, a practice which has resulted in Defendants unlawfully

collecting money from consumers throughout the State of Illinois, and to obtain redress for all

persons injured by such conduct. Plaintiffs, for their class action complaint, allege as follows

---

[1] On November 6, 2008, Plaintiff Gantchev filed a corrected class action complaint against
defendant Predicto Mobile, LLC.

upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## PARTIES

1.     Plaintiff Kiril Gantchev is a resident of Illinois.

2.     Plaintiff Margaret Ryan is a resident of Illinois.

3.     NextWeb Media, LLC ("NextWeb") is a provider of telephonic services known as "premium content" that it markets to both cellular and landline telephone consumers through numerous subsidiaries and/or other affiliates, such as codefendants Predicto Mobile, LLC and Email Discounts, LLC. NextWeb is a Nevada limited liability company with its headquarters and principal place of business in New York. It does business throughout the State of Illinois and in this County.

4.     Defendant Predicto Mobile, LLC ("Predicto") is a provider of premium content to cellular telephones in the United States. It is a Delaware limited liability company nominally headquartered in New Jersey.

5.     Defendant Email Discounts, LLC ("Email Discounts") is a provider of premium content to landline telephones in the United States. It is a Nevada limited liability company headquartered in New York. Defendants Predicto and Email Discounts are owned, operated and controlled by Defendant NextWeb.

6.     Defendant OpenMarket, Inc. ("OpenMarket") is a billing processor, or "aggregator," that bills cellular telephone consumers for premium content services provided by third-parties such as Defendants NextWeb and Predicto. Premium content for cellular telephones consists of, among other things, ringtones, games, graphics, horoscopes, news, and other products and services. OpenMarket is a Michigan corporation with its headquarters and

2

principal place of business in the State of Washington. It does business throughout the State of Illinois and in this County.

7.     Enhanced Business Services, Inc., ("ESBI") is a billing processor, or "aggregator," that bills landline telephone consumers for premium content services provided by third-parties such as Defendants NextWeb and Emails Discounts. Premium content for landline telephones consists of, among other things, games, horoscopes, coupons, dieting tips, fax services, business advice, and other products and services. ESBI is a Delaware corporation with its headquarters and principal place of business in the State of Texas. It does business throughout the State of Illinois and in this County.

**VENUE**

8.     Venue is proper in Cook County because Defendants do business in Cook County.

**CONDUCT COMPLAINED OF**

9.     Today's telephones are far more complex instruments than the traditional landline-based telephones of the past. Instead of mere tools for sending and receiving calls, modern telephones - both landlines and mobile phones - have increasingly been used by consumers to transact commerce with third parties, in some ways like a common credit card. Such ability permits telephone subscribers to purchase a vast variety of products or services provided by a rapidly growing industry of third-party vendors such as Defendant NextWeb and its subsidiaries. These additional products and services are collectively referred to in the telecommunications industry as "premium content."

10.     For cellular telephone subscribers, premium content ranges from weather alerts to traffic reports and sports scores to Defendant Predicto's self-described "phone games," which,

3

according to Predicto's website, "lets you vote on fun questions from your cell phone" for which "$9.99 will be charged monthly to your mobile phone bill."

11.     For landline telephone subscribers, premium content includes web hosting products, diet monitoring services, email accounts such as Defendant Email Discounts's services which, according to a NextWeb website, purports to offer an "exclusive access . . . email service [where] you get $1000.00 in online coupons plus Cash-Back on every purchase you make - for just $14.95/mo."

12.     Many premium content third-party vendors, such as NextWeb, do not distinguish between mobile and landline premium content other than in marketing materials. These third-party vendors elect instead, for cost efficiency purposes, to consolidate and streamline into a single operation the creation and billing of such products and services. Despite the existence of such a centralized operation, NextWeb maintains the appearance of disparate and unrelated activities through numerous subsidiaries and other affiliates, such as Defendants Predicto and Email Discounts, so as to conceal from both the public and government agencies the breadth of its fraudulent and/or otherwise unlawful conduct described herein.

13.     Indeed, NextWeb is one of a plethora of companies that create premium content and market it to both landline and cell phone consumers under the names of small, nominally independent shell corporations such as Predicto and Email Discounts, as well as others with names such as Residential Email, LLC, Voicemail Direct USA, LLC and Email Discount Network, LLC, all of which are controlled by the same owners as NextWeb.

14.     While companies such as NextWeb and its subsidiaries create and often market premium content themselves, telephone subscribers are not billed directly by these premium content providers. Instead, premium content providers like NextWeb partner with middlemen

4

known as "aggregators," such as OpenMarket for cell phone premium content and ESBI for landline premium content. These aggregators provide a conduit between the numerous, diverse and comparatively small premium content providers and the large telephone carriers, such as AT&T, in order to facilitate the premium content providers' ability to: (i) use a carrier's network to deliver their services to that carrier's subscribers; and/or (ii) use a carrier's billing system to collect payment for their premium content services from that carrier's subscribers. In return, the aggregators and the carriers each receive and retain a percentage of the premium content charges.

15.     The rapid and largely unplanned growth of the premium content industry has led both to the above-described structure and to a disastrous flaw within it. That flaw—understood, perpetuated, and even encouraged by aggregators, content providers, carriers, affiliate marketers, and other industry actors such as instant Defendants—is an open secret within the industry, but little understood outside of it. In short, the billing and collection systems established and utilized by companies, including the instant Defendants, in aid of and enriching the premium content industry are conspicuously free of any checks or safeguards to prevent erroneous and unauthorized charges from being added to customers' bills.

16.     The premium content industry generates vast revenue for all parties involved: the premium content providers, including Defendant NextWeb and its subsidiaries, aggregators such as OpenMarket and EBSI, and the telephone carriers. However, much of this revenue has been illegitimately and unlawfully collected. The primary sources of the problem are the misleading marketing representations made by unscrupulous premium content providers such as Defendant NextWeb and its agents, as well as the lack of commercial viability of many of Defendants' "services." Indeed, after revealing that it had engaged in fraudulent marketing tactics and that less than five (5) percent of consumers it charged "had ever requested or used" its services,

NextWeb subsidiary Email Discount Network LLC settled in 2007 a lawsuit brought against it by the State of Florida Attorney General's Office for charging consumers for unauthorized premium content.

17.    Defendant NextWeb's methods for determining authorization (or lack thereof) continue today to be highly problematic as it contracts on behalf of its subsidiaries with affiliate marketers, such as Celebrity Squares, LLC, among others, who frequently obtain telephone numbers to be charged from little more information than that which is readily available through the public domain, such as one's name or telephone number. By comparison, a consumer who uses a check must sign it to prove he or she authorizes payment. Many merchants also require check-users to show an additional form of identification such as a drivers' license or state-issued ID. An issuing bank then uses that signature to verify whether the consumer actually authorized payment. Similarly, a consumer who uses a credit card must provide, at a minimum, both the credit card number and date of expiration; more often than not a credit card user must also sign a receipt or, if the transaction takes place online, provide his or her three-digit credit card security code, the zip code of the card's billing address and/or a matching street address. Credit card providers have additional levels of security in place that analyze a consumer's particular transaction, based on the transaction's similarity to that consumer's previous transactions, in order to determine how likely a particular transaction may be the result of fraud or theft.

18.    In stark contrast, a premium content provider can cause any consumer to be billed for premium content services once it has that consumer's telephone number, even if the consumer never agreed to purchase its services or was never informed about the charge for such services. Premium content providers such as Defendants NextWeb and Residential Email frequently just have to provide to an aggregator such as ESBI or its parent company, Billing

Services Group ("BSG") a cell phone or landline number and an amount to charge, and the aggregator simply relays that information to the carrier to put a charge on the telephone bill that has that number. Indeed, when confronted, many premium content providers attempt to create the appearance that a charge was authorized by producing a "customer's" personal demographic information, such as a street address or mother's maiden name. However, much of this information may be and actually is acquired in bulk through vendors, rather than legitimately from the customers themselves. Despite this, industry participants will frequently feign good-will and offer protesting consumers refunds but almost always in an amount less than what was charged. Indeed, Defendants effectively employ a "charge first, refund later – if at all" approach to business to conceal the scope of their fraudulent activity. Because each of the four parties involved - affiliate marketer, premium content provider, aggregator, and the carrier - keep a portion of every charge, they maintain this system despite knowing that large numbers of people are being billed for services they neither wanted nor authorized.

19. This problem is exacerbated by the fact that charges for premium content services are often not clearly identified on subscribers' bills, thereby making it difficult if not impossible for subscribers to identify the origin or nature of the charge, or to distinguish it from the numerous other line-item charges and fees that appear on the average consumer's telephone bill. In addition, because charges for premium content services are sometimes just a few dollars, subscribers who have recurring third-party charges may fail to notice such charges, much less anticipate the appearance of such charges on an ordinary cell phone or landline telephone bill.

20. Put simply, industry participants collectively, including Defendants, have knowingly constructed billing systems with no effective checks to ensure that when they place a charge for premium content placed on a consumer's telephone bill, the billed party actually

7

desired the premium content service and authorized the charge for the service. Instead, Defendants and their agents need only provide a carrier with a subscriber's telephone number in order to place a charge for premium content services on that consumer's bill. The result is that an untold number of Defendants' "customers" have been charged for premium content services they never authorized. Because Defendants profit significantly from this practice, they have done nothing to remedy this flawed billing system. Indeed, they have only redoubled their efforts to further deceive consumers into signing up for such "premium" products and services.

21.     Despite Defendants' knowledge of their fraudulent and illegalconduct and their ability to stop their unauthorized billing practices, they have purposefully maintained this system because it is a source of significant profit. However, the damage Defendants have caused to date pales in comparison to the damage which will occur if this system is not fixed given the growth of the premium content services industry, and the increasing opportunities subscribers have to use their telephones as credit cards.

22.     Indeed, while the total sales of premium content in Illinois amount to a significant sum, the business is still in its infancy. The burgeoning industry has already expanded from ordinary ringtones and coupons to mass media-related products such as interactive radio and participatory voting at television and concert events and, most recently, to services that enable telephones to function as credit cards. Unchecked, Defendants' practices will injure an ever-increasing number of unwitting consumers.

**The Role of Aggregators OpenMarket and ESBI in the Scheme to Defraud**

23.     In order to tap into the emerging premium content marketplace and make content services available to telephone subscribers, content providers such as NextWeb and its subsidiary Defendants Predicto and Residential Email must first obtain access to telephone carriers'

8

communications networks and frequently do so by "partnering" with aggregators—intermediary companies such as OpenMarket and ESBI that offer content providers (their "content provider partners") direct access to the carriers through existing relationships. This allows content providers to focus on developing and marketing branded premium content, applications, and programs while aggregators manage the complex carrier relationships, distribution and billing.

24.    Aggregators operate premium content transaction networks that help companies develop, deliver, and bill for such services to telephones throughout the State of Illinois and indeed the nation. There are two distinct types of aggregators: those that serve the cellular telephone market exclusively, such as OpenMarket, and those that serve the landline telephone market exclusively, such as ESBI. Defendant NextWeb and/or its subsidiaries have contracted with both OpenMarket and ESBI to propagate its fraudulent conduct to the widest possible consumer market. Indeed, an indication of the extent of such fraud throughout both cellular and landline marketed is the extraordinarily high refund rates for premium content charges processed by both aggregators OpenMarket and ESBI.

25.    By using their end-to-end technology platforms, their relationships with U.S. telephone carriers, and other value-added services, OpeMarket and ESBI have forged a crucial link between the carriers and premium content providers. They have enabled the transformation of telephony into a new medium of commerce by providing marketing, content delivery and a collections process, all the while carving out a profitable role for themselves as very critical middlemen in this rapidly growing industry.

26.    Aggregators, including OpenMarket and ESBI have developed a vast distribution system that integrates into the telephone networks of every major landline and cellular telephone carrier nationwide, providing direct connections to the vast majority of landline and cellular

9

telephone consumers nationwide. Aggregator Defendants OpenMarket and ESBI each respectively have hundreds of content providers customers such as Defendants NextWeb and its subsidiaries.

27.     While aggregators charge their content provider customers some upfront fees, their revenue is primarily generated through a "revenue share" on transactions for which they bill telephone subscribers: each time a charge is incurred in connection with the purchase of premium content services, the aggregator and/or the content provider cause said charge to be billed directly on the telephone bill of the telephone carrier's customer who currently owns and/or uses the telephone number (claimed to be) associated with such purchase.

28.     The wireless carrier then bills and collects the charge from their current subscriber, retains a portion of the proceeds as their "revenue share," and remits the balance to the aggregator who has direct access to their network and who retains a percentage of the balance in the form of their own "revenue share." The aggregator then remits the remainder directly to the content provider (or, in some instances, to another aggregator who retains a percentage of the balance in the form of their own "revenue share" and remits the balance to their content provider client).

29.     Aggregators, including Defendants OpenMarket and ESBI, have in the United States registered numerous transactions and processed significant amounts of money in transactions over recent years and have profited greatly from their arrangement with their industry partners. As both OpenMarket and ESBI know, many of the transactions they process are unauthorized premium content charges yet each continues to process such charges unabated, even in the midst of investigation by government agencies. Indeed, ESBI is the subject of a current investigation undertaken by the State of Florida Attorney General's Office for

10

"cramming of unauthorized charges on consumers landline telephone bills," according to the Florida Attorney General's website.

30.     Defendants' continued conduct in billing telephone subscribers for premium content, combined with their failure to implement a billing system that would ensure only consumers who did, in fact, authorize charges for such services were billed for them, is a deliberate strategy by Defendants to unlawfully collect small sums of money from a large number of consumers. And while it has always been within the power of companies such as Defendants to institute simple and effective measures that would prevent this, they have instead knowingly maintained the very system that has allowed these erroneous charges. Indeed, Defendants have reaped and retained their shares of the improper collections.

### THE FACTS RELATING TO THE NAMED PLAINTIFF GANTCHEV

31.     During the relevant period, new cellular telephone service was purchased by Plaintiff Gantchev from an established wireless carrier or its authorized agent.

32.     In or about 2008, Plaintiff's cell phone account was charged by Defendants OpenMarket and NextWeb for unwanted and unauthorized premium content services associated with Defendant Predicto.

33.     At no time did Plaintiff authorize the purchase of these products and services offered by such Defendants.

34.     At no time did Plaintiff authorize Defendants or anyone else to bill him for these services.

35.     Defendants have yet to provide Plaintiff a full refund of the unauthorized charges consisting of the premium content charges, data charges, taxes, back interest, lost time associated

with disputing such charges, and/or a credible assurance that such unauthorized charges would not appear in future billing periods.

## THE FACTS RELATING TO THE NAMED PLAINTIFF RYAN

36.     During the relevant period, Plaintiff Ryan purchased new landline telephone service for her own use from an established landline carrier.

37.     In or about 2009, Ryan's phone account was charged by Defendants ESBI and NextWeb for unwanted and unauthorized premium content services associated with Defendant Email Discounts.

38.     At no time did Plaintiff authorize the purchase of these products and services offered by such Defendants.

39.     At no time did Plaintiff authorize Defendants or anyone else to bill her for these services.

40.     Defendants have yet to provide Plaintiff a full refund of the unauthorized charges consisting of the premium content charges, data charges, taxes, back interest, lost time associated with disputing such charges, and/or a credible assurance that such unauthorized charges would not appear in future billing periods.

## CLASS ALLEGATIONS

41.     Plaintiffs bring this action on behalf of themselves and a Class and two Subclasses, defined as follows:

(a) A class ("NextWeb Class") consisting of all telephone subscribers in Illinois who suffered losses or damages as a result of billing for services associated with Defendant NextWeb or its affiliates, including without limitation Defendants Predicto and Email Discounts,

not authorized by the subscriber; provided, however, that the following are excluded from this Class: (i) the Defendants, and (ii) any employee of Defendants.

(b) A subclass (the "OpenMarket Subclass") consisting of all members of the Class who suffered losses or damages as a result of billing by Defendant OpenMarket for services associated with Defendant NextWeb or its affiliates, including Defendant Predicto, not authorized by the subscriber; provided, however, that the following are excluded from this Class: (i) the Defendants, and (ii) any employee of Defendants.

(c) A subclass (the "ESBI Subclass") consisting of all members of the Class who suffered losses or damages as a result of billing by Defendant ESBI for services associated with Defendant NextWeb or its affiliates, including Defendant Email Discounts, not authorized by the subscriber; provided, however, that the following are excluded from this Class: (i) the Defendants, and (ii) any employee of Defendants.

42.    Plaintiffs' claims are typical of the claims of the other members of the Class and Subclasses in that each was charged for premium content products and services associated with Defendant NextWeb and/or subsidiaries Predicto or Email Discounts that they did not authorize.

43.    Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class and Subclasses. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclasses, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Class and Subclasses.

44.    Absent a class action, most members of the Class and Subclasses would find the cost of litigating their claims to be prohibitive, and would have no effective remedy. Class

13

treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the Judiciary and the litigants, and promotes consistency and efficiency of adjudication.

45.     Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the other members of the Class and Subclasses, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the other members of the Class and Subclasses.

46.     The factual and legal bases of Defendants' liability to Plaintiffs and the other members of the Class and Subclasses are the same, resulting in injury to Plaintiffs and to the other members of the Class and Subclasses. Plaintiffs and the other members of the Class and Subclasses have all suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

47.     There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class and Subclasses, and those questions predominate over any questions that may affect individual members of the Class and Subclasses. Common questions for the NextWeb Class include but are not limited to the following:

    (a)     Whether NextWeb's conduct, on its own behalf and through its
            subsidiaries including Predicto and Email Discounts, described herein
            amounts to unjust enrichment.

    (b)     Whether NextWeb's conduct, on its own behalf and through its
            subsidiaries including Predicto and Email Discounts, described herein
            amounts to tortuous interference with a contract.

14

      (c)      Whether NextWeb's conduct, on its own behalf and through its

subsidiaries including Predicto and Email Discounts, described herein

amounts to consumer fraud.

Common questions for the OpenMarket and ESBI Subclasses include but are not limited to the

following:

      (a)      Whether the conduct of OpenMarket and ESBI respectively described

herein amounts to unjust enrichment.

      (b)      Whether the conduct of OpenMarket and ESBI respectively described

herein amounts to tortious interference with a contract.

      (c)      Whether the conduct of OpenMarket and ESBI respectively described

herein amounts to consumer fraud.

## COUNT I
### (Restitution/Unjust Enrichment on behalf of the NextWeb Class)

48.      Plaintiffs incorporate by reference the foregoing allegations.

49.      Plaintiffs and the Class have conferred a benefit upon Defendants NextWeb,

Predicto and Email Discounts in that such Defendants have received and retained money

belonging to Plaintiffs and the other members of the Class resulting from their knowingly having

billed and collected unauthorized third party premium content charges.

50.      Such Defendants appreciate or have knowledge of said benefit.

51.      Under principles of equity and good conscience, such Defendants should not be

permitted to retain the money belonging to Plaintiffs and the other members of the Class, which

such Defendants have unjustly received as a result of their actions.

## COUNT II
### (Tortious Interference with a Contract on behalf of the NextWeb Class)

52.     Plaintiffs incorporate by reference the foregoing allegations.

53.     Plaintiffs and the Class had contractual relationships with their telephone carriers whereby they agreed to pay a certain sum of money in exchange for activation of their telephone accounts and their carriers' promise to provide various communication and related services to Plaintiffs and the Class and to bill Plaintiffs and the Class only for products or services the purchase of which they authorized.

54.     Defendants NextWeb, Predicto and Email Discounts knew of said contractual relationships and intended to and did induce a breach or disruption of the contractual relationships.

55.     Such Defendants intentionally interfered with said contractual relationships through improper motives and/or means by knowingly and/or recklessly continually causing to be placed unauthorized premium content charges on the telephone bills of telephone subscribers throughout the State of Illinois.

56.     Plaintiffs and the other members of the Class suffered loss as a direct result of the conduct of such Defendants.

## COUNT III
### (Violations of the Illinois Consumer Fraud and Deceptive
### Business Practices Act, 815 ILCS 505/1 *et. seq.* on Behalf of the NextWeb Class)

57.     Plaintiffs incorporate by reference the foregoing allegations.

58.     Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA") declares unlawful "any [u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false

16

pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."

59.     Defendant NextWeb, by and through its subsidiaries including Defendants Predicto and Email Discounts, violated, and continues to violate this proscription through its conduct alleged above.

60.     NextWeb, through its conduct alleged above, has obtained money from Plaintiffs and the other members of the Class. Plaintiffs and the other members of the Class ask that this Court restore that money to Plaintiffs and enjoin Defendant NextWeb and its subsidiary Defendants from continuing their illegal practices.

61.     Defendant's conduct is ongoing and continues to this date. Plaintiffs, the Class members and the general public are therefore entitled to the relief described herein.

### COUNT IV
### (Restitution/Unjust Enrichment on behalf of the OpenMarket Subclass)

62.     Plaintiff Gantchev incorporates by reference the foregoing allegations.

63.     Plaintiff Gantchev and the other members of the OpenMarket Subclass have conferred a benefit Defendant OpenMarket in that OpenMarket has received and retained money belonging to Plaintiff Gantchev and the other members of the OpenMarket Subclass resulting from its billing and collection of unauthorized mobile premium content charges.

64.     Defendant OpenMarket appreciates or has knowledge of said benefit.

65.     Under principles of equity and good conscience, Defendant OpenMarket should not be permitted to retain the money belonging to Plaintiff Gantchev and the other members of the OpenMarket Subclass, which OpenMarket has unjustly received as a result of its actions.

## COUNT V
### (Tortious Interference with a Contract on behalf of the OpenMarket Subclass)

66.     Plaintiff Gantchev incorporates by reference the foregoing allegations.

67.     Plaintiff Gantchev and the other members of the OpenMarket Subclass had contractual relationships with their cellular telephone carriers whereby they agreed to pay a certain sum of money in exchange for activation of their telephone accounts and their carriers' promise to provide various communication and related services to Plaintiff Gantchev and the Subclass and to bill Plaintiff Gantchev and the Subclass only for products or services the purchase of which they authorized.

68.     Defendant OpenMarket knew of said contractual relationships and intended to and did induce a breach or disruption of the contractual relationships.

69.     Defendant OpenMarket intentionally interfered with said contractual relationship through improper motives and/or means by knowingly and/or recklessly continually causing to be placed unauthorized premium mobile content charges on the telephone bills of telephone subscribers throughout the State of Illinois.

70.     Plaintiff Gantchev and the other members of the OpenMarket Subclass suffered loss as a direct result of the conduct of OpenMarket.

## COUNT VI
### (Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et. seq* on Behalf of the OpenMarket Subclass)

71.     Plaintiff Gantchev incorporates by reference the foregoing allegations.

72.     Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA") declares unlawful "any [u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false

18

pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."

73.    Defendant OpenMarket violated, and continues to violate this proscription through its conduct alleged above.

74.    OpenMarket, through its acts of unfair competition, has obtained money from Plaintiff Gantchev and the other members of the OpenMarket Subclass.  Plaintiff Gantchev and the other members of the OpenMarket Subclass ask that this Court restore that money to them and enjoin OpenMarket from continuing its illegal practices.

75.    Such conduct is ongoing and continues to this date.  Plaintiff Gantchev, the OpenMarket Subclass members and the general public are therefore entitled to the relief described herein.

## COUNT VII
### (Restitution/Unjust Enrichment on behalf of the ESBI Subclass)

76.    Plaintiff Ryan incorporates by reference the foregoing allegations.

77.    Plaintiff Ryan and the other members of the ESBI Subclass have conferred a benefit upon Defendant ESBI in that ESBI has received and retained money belonging to Plaintiff Ryan and the other members of the ESBI Subclass resulting from its billing and collection of unauthorized landline premium content charges.

78.    Defendant ESBI appreciates or has knowledge of said benefit.

79.    Under principles of equity and good conscience, Defendant ESBI should not be permitted to retain the money belonging to Plaintiff Ryan and the other members of the ESBI Subclass, which ESBI has unjustly received as a result of its actions.

## COUNT VIII
### (Tortious Interference with a Contract on behalf of the ESBI Subclass)

80.     Plaintiff Ryan incorporates by reference the foregoing allegations.

81.     Plaintiff Ryan and the other members of the ESBI Subclass had contractual

relationships with their landline telephone carriers whereby they agreed to pay a certain sum of

money in exchange for activation of their telephone accounts and their carriers' promise to

provide various communication and related services to Plaintiff Ryan and the Subclass and to bill

Plaintiff Ryan and the Subclass only for products or services the purchase of which they

authorized.

82.     Defendant ESBI knew of said contractual relationships and intended to and did

induce a breach or disruption of the contractual relationships.

83.     Defendant ESBI intentionally interfered with said contractual relationship through

improper motives and/or means by knowingly and/or recklessly continually causing to be placed

unauthorized premium landline content charges on the telephone bills of telephone subscribers

throughout the State of Illinois.

84.     Plaintiff Ryan and the other members of the ESBI Subclass suffered loss as a

direct result of the conduct of ESBI.

## COUNT IX
### ((Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et. seq* on Behalf of the ESBI Subclass)

85.     Plaintiff Ryan incorporates by reference the foregoing allegations.

86.     Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act

("CFA") declares unlawful "any [u]nfair methods of competition and unfair or deceptive acts or

practices, including but not limited to the use or employment of any deception, fraud, false

20

pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."

87.    Defendant ESBI violated, and continues to violate this proscription through its conduct alleged above.

88.    ESBI, through its acts of unfair competition, has obtained money from Plaintiff Ryan and the other members of the ESBI Subclass. Plaintiff Ryan and the other members of the ESBI Subclass ask that this Court restore that money to them and enjoin ESBI from continuing its illegal practices.

89.    Such conduct is ongoing and continues to this date. Plaintiff Ryan, the ESBI Subclass members and the general public are therefore entitled to the relief described herein.

WHEREFORE, Plaintiffs Kiril Gantchev and Margaret Ryan, on behalf of themselves, a Class and two Subclasses, pray for the following relief:

a.    Certify this case as a class action on behalf of the Class and Subclasses as defined above and appoint Kiril Gantchev and Margaret Ryan as Class Representatives, and appoint the undersigned as lead counsel;

b.    Declare that the actions of Defendants, as set out above, constitute unjust enrichment, and tortuous interference with a contract;

c.    Enter judgment against Defendants for all economic, monetary, actual, consequential, and compensatory damages caused by its conduct;

d.    Award Plaintiffs, the Class and the Subclasses reasonable costs and attorneys' fees;

e.    Award Plaintiffs, the Class and Subclasses pre- and post-judgment interest;

f.    Enter judgment for injunctive, statutory, and/or declaratory relief as is necessary to protect the interests of Plaintiffs, the Class and Subclasses;

21

g.    Declare that the actions of Defendants, as set forth above, as well as in other respects, constitute a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act on behalf of the Class and Subclasses, respectively; and

h.    Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiffs request trial by jury of all claims that can be so tried.

Dated: March 6, 2009               Respectfully submitted,

KIRIL GANTCHEV and MARGARET RYAN,
individually and on behalf of a class of similarly
situated individuals

By: _____
               One of Their Attorneys

Jay Edelson
Myles McGuire
Rafey S. Balabanian
Michael J. Aschenbrener
KamberEdelson LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Telephone: 312.589.6370
Facsimile: 312.589.6378
Firm I.D. 44146

22

# EXHIBIT B

## **DECLARATION OF ANDREA KRUCHINSKI**

Pursuant to 28 U.S.C. ¶ 1746, I, Andrea Kruchinski, hereby declare and state as follows:

1.      I am a member of the Regulatory Department for defendant Enhanced Services Billing, Inc. ("ESBI").  I make this declaration in support of ESBI's Notice of Removal.  I have personal knowledge of the facts set forth herein and, if called upon, could and would competently testify thereto under oath.

2.      I understand that Mr. Kiril Gantchev and Ms. Margaret Ryan have filed an action against ESBI, Predicto Mobile, LLC, NextWeb Media, LLC ("NextWeb"), Email Discounts, LLC ("Email Discounts"), and OpenMarket, Inc. that purports to be on behalf of a class of "all telephone subscribers in Illinois who suffered losses or damages as a result of billing for services associated with Defendant NextWeb or its affiliates."

3.      ESBI forwarded charges for services provided by NextWeb affiliates, including Email Discounts, to Illinois local exchange carriers ("LECs") to be included on the LECs' local telephone bills of 104,965 telephone subscribers in Illinois over the past five years.

4.      For purposes of my declaration, "telephone subscribers in Illinois" consists of all people and entities with a unique billing telephone number that includes a telephone area code assigned to a geographic area within Illinois, such as area codes 217, 224, 309, 312, 618, 630, 708, 773, 815, and 847.  Therefore, there is a telephone subscriber in Illinois for each unique billing number with an Illinois area code.

5.      The charges from NextWeb affiliates, including Email Discounts, that ESBI forwarded to Illinois LECs to be included on the local telephone bills of persons or entities in Illinois totaled $6,735,432.60 during the past five years.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 13 th day of April 2009, in San Antonio, Texas.

Andrea P. Kruchinski

Andrea Kruchinski
Legal and Regulatory Analyst

CHI99 5106979-1.072972.0023

-2-

# GROUP EXHIBIT C



LEXSEE 2001 U.S. DIST. LEXIS 17214



Positive
As of: Apr 15, 2009

**KHALIL ABDUR RAHIM, Representative of the Estate of GREGORY MAY, MICHAEL DATES, and WARDELL KYLES, Plaintiffs, vs. MICHAEL F. SHEAHAN, Sheriff of Cook County, RICHARD REMUS, Superintendent for External Operations, Cook County Department of Corrections, ERNESTO VELASCO, Director, Cook County Department of Corrections, Defendants.**

No. 99 C 0395

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2001 U.S. Dist. LEXIS 17214*

**October 18, 2001, Decided
October 19, 2001, Docketed**

**PRIOR HISTORY:** *May v. Sheahan, 226 F.3d 876, 2000 U.S. App. LEXIS 22676 (7th Cir. Ill. 2000)*

**DISPOSITION:** [*1] Magistrate recommendation: Plaintiffs' second amended motion for class certification should be granted.

**COUNSEL:** For GREGORY MAY, MICHAEL DATES, WARDELL KYLES, plaintiffs: Thomas M. Peters, Attorney at Law, Kevin R. Peters, Attorney at Law, Chicago, IL.

For MICHAEL F SHEAHAN, defendant: Allen Stewart Kirsh, Schoenberg, Fisher, Newman & Rosenberg, Ltd., Chicago, IL.

For MICHAEL F SHEAHAN, defendant: Thomas M. Burnham, Patrick T. Driscoll, Jr., Michael David Jacobs, Meribeth Mermall, Cook County State's Attorney, Chicago, IL.

For MICHAEL F SHEAHAN, defendant: Kevin G. Kulling, Hervas, Sotos, Condon & Bersani, Itasca, IL.

For MICHAEL F SHEAHAN, ERNESTO VELLASCO, RICHARD REMUS, defendants: Peter David Zaper, Attorney at Law, Chicago, IL.

For ERNESTO VELLASCO, RICHARD REMUS, defendants: Patrick T. Driscoll, Jr., Cook County State's Attorney, Chicago, IL.

**JUDGES:** SIDNEY I. SCHENKIER, United States Magistrate Judge.

**OPINION BY:** SIDNEY I. SCHENKIER

**OPINION**

**REPORT AND RECOMMENDATION**

This putative class action is brought by former inmates of the Cook County Department of Corrections ("CCDC"): Gregory May (who now is deceased, and whose action is being pursued by his representative, Khalil [*2] Abdur Rahim), Michael Dates and Wardell Kyles (neither of whom currently is a prisoner of CCDC). [1] The defendants are Michael F. Sheahan, the Sheriff of Cook County, Richard Remus, the Superintendent for External Operations, CCDC, and Ernesto

2001 U.S. Dist. LEXIS 17214, *

Velasco, the Director of CCDC, all of whom are sued in their official and individual capacities.

> 1 Mr. May was named as the lead plaintiff or class representative when this case initially was filed on January 22, 1999. In a Fourth Amended Complaint, filed on July 9, 2001, two more plaintiffs were added as class representatives: Messrs. Dates and Kyles.

The plaintiffs have filed a second amended motion for class certification pursuant to *Federal Rule of Civil Procedure 23(b)(2) and (3)* (doc. # 76). This motion has been referred to this Court for a report and recommendation (doc. # 64). For the reasons discussed below, the Court recommends that plaintiffs' motion for class certification under *Rule 23(b)(3)* be granted.

I.

This lawsuit challenges defendants' alleged [*3] policies concerning the treatment of pretrial detainees who are taken to hospitals for medical treatment. As originally filed, the case involved claims solely by Mr. May concerning his treatment while at Cook County Hospital in January 1999. Mr. May alleged that the Sheriff's Department maintained the following policies which violated his rights:

> One such policy allegedly requires hospital detainees to be shackled, hand and foot, to their beds despite the 24-hour presence of an armed guard. May claims that as a result of this policy he has been shackled to his bed 24 hours-a-day, which has caused him physical and emotional pain and has impeded his ability to assist in his own defense. Another policy supposedly provides that hospital detainees will not be taken to assigned court dates and will not be otherwise accommodated (by telephone or video conference, for example). Pursuant to this policy, May claims that he has been unable to present a motion to reduce his bond or attend any court appearances. Still other policies allegedly restrict or deny hospital detainees access to their lawyers, visitors, legal materials, telephones, typewriters or computers, books and magazines, [*4] and recreational activities. According to May, because of these policies he has been denied access to his attorney, has been unable to receive visitors, has been prevented from assisting in his own defense, and has had limited or no access to vari-

ous ordinary amenities of confinement in Cook County Jail.

*May v. Sheahan, 226 F.3d 876, 878 (7th Cir. 2000).*

Based on these alleged policies, Mr. May asserted constitutional violations of equal protection, due process and the *First Amendment* (by denial of access to the courts), and a statutory violation under the Americans with Disabilities Act ("ADA"). The presiding district judge dismissed the ADA claim against Mr. Sheahan (who at the time was the only named defendant) in his individual capacity on qualified immunity grounds, and in all other respects denied the motion to dismiss. Mr. Sheahan appealed the denial of qualified immunity on the constitutional claims, and on review, the Seventh Circuit affirmed the denial of qualified immunity, holding that "the contours of each of the constitutional rights [Mr. May] asserts was clearly established at the time in question," and that as a result, Mr. Sheahan "is not [*5] entitled to qualified immunity on the constitutional claims [Mr.] May asserts." *May, 226 F.3d at 884.*

On remand, the amended complaint has been further amended to add two new plaintiffs (Messrs. Dates and Kyles). [2] Mr. Kyles alleges that he was arrested on or about November 16, 1998, and during the course of that arrest he was shot (Fourth Am. Compl., Count V, P 8). As a result of the bullet wound, he was paralyzed from the neck down (*Id.*, P 9), and he was taken to Mt. Sinai Hospital, where he was in the custody of defendants and subjected to the same policies alleged by Mr. May, even though he was paralyzed and in a coma (*Id.*, PP 10-11). When Mr. Kyles emerged from his coma and regained some use of his arms, he was transferred from Mt. Sinai to Cook County Hospital (*Id.*, PP 12-15). However, even though he had intravenous tubes in one arm and no movement in his legs, he remained subject to the same policies, including shackling, at all times (*Id.*). In early December 1998, Mr. Kyles was transferred to Oak Forest Hospital (*Id.*, P 16-18). While he was there, Mr. Kyles was again subjected to the same policies: he was cuffed by one arm, had intravenous [*6] tubes in the other arm, and had one leg shackled to his bed, even though he had no movement below the waist (*Id.*, P 18). At all times and in each of the three hospitals where he was detained, Mr. Kyles alleges that he was subjected to armed guard; his access to his attorney and family was impeded; he was denied the opportunity to prepare his defense; and he was not taken to any scheduled court appearances, which delayed the final disposition of his case and caused him to remain in custody for a longer period of time (*Id.*, Counts VI-VIII).

2 The current pleading is the Fourth Amended Complaint. During the appeal, Mr. May twice was granted leave by the presiding district judge to amend (the second and third amended complaints). But the Court of Appeals struck those complaints because it found that the appeal had divested the district court of power to grant leave to file the second and third amended complaints. *May, 226 F.3d at 880.*

Mr. Dates was arrested on or about December 15, 1998 (Count [*7] IX, P 8). Mr. Dates alleges that his jaw was broken at the time of his arrest, and therefore was taken to St. Anthony Hospital (*Id.,* P 9). Mr. Dates was detained at St. Anthony Hospital for three to five days; during that time, his jaw was wired shut and he had intravenous tubes in one arm (*Id.,* PP 10-14). While at St. Anthony Hospital, Mr. Dates alleges that he was subjected to the same policies as Messrs. May and Kyles (*Id.*). In December 1998, Mr. Dates alleges that he was transferred to Cook County Hospital, where he remained for several weeks, during which time he claims that he was subject to the same policies alleged by Messrs. May and Kyles (*Id.,* PP 15-16; Counts X-XII).

As presently constituted, the Fourth Amended Complaint alleges thirteen counts against Mr. Sheahan and two additional defendants not originally named -- Messrs. Remus and Velasco. In Counts I through IV, the May Estate realleges the same violations of his rights under the *equal protection clause,* the ADA, the due process clause, and -- implicitly -- the *First Amendment* (by claiming denial of his right of access to the courts). The only significant change in the allegations concerning Mr. [*8] May is to assert that he is deceased and that Mr. Rahim is the representative of his estate. In Counts V through VIII and Counts IX through XII, respectively, Messrs. Kyles and Dates assert these same four causes of action pled by the May Estate. In Count XIII, plaintiffs seek certification as a *Rule 23(b)(2)* and *(b)(3)* class based on the discriminatory policies alleged in Counts I and V, and request declaratory, injunctive and monetary relief. During the pendency of this class certification motion, defendants have answered the Fourth Amended Complaint, and have interposed eight affirmative defenses.

## II.

In their motion for class certification, the plaintiffs argue that all prerequisites for class certification have been met and that certification is proper under *Rules 23(b)(2)* and *(b)(3).* The defendants counter that the plaintiffs have failed to meet the commonality and typicality requirements of *Rules 23(a)(2)* and *(a)(3);* and that plaintiffs also fail to satisfy the requirements of *Rules 23(b)(2)* and *(b)(3)* (Defs.' Resp. at 2-6). Defendants further contend that class certification should be denied due to plaintiffs' failure to exhaust administrative remedies pursuant to the [*9] Prison Litigation Reform Act ("PLRA"), *42 U.S.C. § 1997e(a),* and plaintiffs' failure to allege actual physical injury pursuant to the PLRA, *42 U.S.C. § 1997e(e)* (Defs.' Resp. at 6-9). In a footnote, the defendants also suggest that plaintiffs do not have standing for injunctive relief because they have no risk of sustaining future injury due to the challenged policies: Mr. May is deceased, and Messrs. Dates and Kyles are no longer "prisoners" (Defs.' Resp. at 7, n.3). Because the standing and PLRA issues are threshold questions, we will address those arguments first.

## III.

The defendant's standing and PLRA arguments must be taken in the context in which they arise: the present motion is limited to the issue of class certification and, indeed, so is our referral. We therefore address the PLRA and the issues of standing only in the certification context (although the same legal principles apply to the issue of dismissal). We will address Article III first, and then take up the issue of the PLRA's exhaustion requirement.

### A. Article III.

Article III of the United States Constitution requires a party seeking to invoke the jurisdiction [*10] of the federal courts to present an "actual case or controversy." *Perry v. Sheahan, 222 F.3d 309, 313 (7th Cir. 2001)* (citing *City of Los Angeles v. Lyons, 461 U.S. 95, 101, 75 L. Ed. 2d 675, 103 S. Ct. 1660 (1983)* and affirming dismissal of claims for injunctive relief on grounds that plaintiffs not likely to sustain future injury). Generally, courts have interpreted this provision to mean that the plaintiff must have a "personal stake" in the outcome and/or that "a plaintiff in search of prospective equitable relief must show a significant likelihood and immediacy of sustaining some injury" to have standing under Article III. *Sierakowski v. Ryan, 223 F.3d 440, 443 (7th Cir. 2000)* (listing three general considerations of (a) actual or imminent injury; (b) a causal connection between the injury and challenged conduct; and (c) a likelihood that injury will be redressed by relief sought). *See also Perry, 222 F.3d at 313.*

Defendants argue that none of these plaintiffs satisfy this Article III requirement. Defendants assert that Messrs. Kyles and Dates lack standing because, by the time they filed suit, they were no longer [*11] detainees and thus had no appreciable risk of being subject to the policies being challenged. As to Mr. May, defendants argue that his claims have become moot because while he was a detainee when suit was filed, his intervening death has eliminated any cognizable Article III interest in this litigation. This argument ignores two considerations

which, in this Court's view, demonstrate that this case meets the requirements of Article III.

*First*, the Article III arguments relied on by defendants do not implicate plaintiffs' claims for monetary relief. The Supreme Court has clearly established a right to recover damages for violations of constitutional rights. In *Carey v. Piphus, 435 U.S. 247, 254, 55 L. Ed. 2d 252, 98 S. Ct. 1042 (1978)*, the Court stated that "the basic purpose" of damages under *42 U.S.C. § 1983* is "to compensate persons for injuries that are caused by the deprivation of constitutional rights." *See also Memphis Comm. School Dist. v. Stachura, 477 U.S. 299, 305, 91 L. Ed. 2d 249, 106 S. Ct. 2537 (1986)*. A plaintiff who allegedly suffers a violation of his constitutional rights does not need to show a likelihood [*12] of further repetition in order to seek damages for that violation, any more than a person negligently hit needs to show it might happen again to seek damages for that event. Thus, Messrs. Kyles and Dates may press claims for damages for the alleged constitutional violations caused by the challenged policies, irrespective of whether they remain pretrial detainees or whether they are likely to be subjected to alleged policies in the future. The same is true for Mr. May -- defendants have offered no reason why his damage claims do not survive his passing.

*Second*, as to the claims for declaratory and injunctive relief, there is no dispute that Mr. May was a detainee at the time of his original suit. As a result, at the outset of this action he had a "personal stake" in a request for equitable relief, because he was at risk of being returned to the hospital and subjected to the alleged constitutional policies. But subject matter jurisdiction must exist not only when the case is filed but when judgment is rendered, *Steffel v. Thompson, 415 U.S. 452, 460 n. 10, 39 L. Ed. 2d 505, 94 S. Ct. 1209 (1974)*, and so postfiling events sometimes can eliminate federal jurisdiction. [*13] That is what defendants Claim happened here with Mr. May's death.

However, defendants ignore that the loss of a plaintiff's "personal stake" in the outcome of the injunctive case will not affect the class, so long as the class members have a continuing, live controversy which is capable of repetition, but may nonetheless evade review. *See United States Parole Comm'n v. Geraghty, 445 U.S. 388, 398, 63 L. Ed. 2d 479, 100 S. Ct. 1202 (1980)* ("when the claim on the merits is capable of repetition, yet evading review, the named plaintiff may litigate the class certification issue despite loss of his personal stake in the outcome of the litigation"); *Friends of The Earth v. Laidlaw Environ. Services, Inc., 528 U.S. 167, 190, 145 L. Ed. 2d 610, 120 S. Ct. 693 (2000)*(same). In *Geraghty*, the Supreme Court cited with approval *Gerstein v. Pugh, 420 U.S. 103, 110 n.11, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975)*, a case which held that the fact that the named plaintiffs

no longer were pretrial detainees at the time of class certification did not render moot the claims challenging pretrial detention conditions. The *Gerstein* reasoned that [*14] the status of detainees may change so quickly as to make it impossible to decide class certification while they were still in custody, and that given the nature of the claims, "the constant existence of a claim of persons suffering the deprivation" would ensure the presence of persons "with a continuing live interest in the case." *Gerstein, 420 U.S. at 110 n. 11.*

This case falls within the *Gerstein/Geraghty* model of a class action alleging violations that are "capable of repetition, yet evading review." Mr. May seeks declaratory and injunctive relief to end policies that allegedly deprive present and future pretrial detainees of their constitutional rights while they are being treated for medical conditions in the hospital. Since enforcement of the defendants' policies is allegedly ongoing, the dispute is capable of repetition. And, since the putative and future class members are unable to seek redress while they are in the hospital and subject to the policy, their claims evade review. Because this policy is capable of repetition but cannot be challenged at the time of the violation, it does not matter if the injunctive action is moot as to Mr. May; it matters [*15] only that the action is not moot as to the putative and future class members, and that these members have a "continuing live interest." (*i.e.*, they were or will be subject to the challenged policies, and these policies will be unreviewable if enforced by the defendants again). The Court therefore finds that the Estate of Mr. May retains standing under Article III to seek declaratory and injunctive relief on behalf of himself and the putative class.

The same cannot be said for Messrs. Dates and Kyles. They were not detainees at the time they joined the Fourth Amended Complaint, and thus they do not have a personal stake in the portion of the litigation that seeks declaratory and injunctive relief. *See Friends of the Earth, 528 U.S. at 190* ("if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum).

B. PLRA Exhaustion.

Standing is not the only threshold question the Court must address. In response to the plaintiffs' class certification motion, the defendants have raised -- for the first time -- the issue of whether the named [*16] plaintiffs have exhausted their administrative remedies under the PLRA (Defs.' Resp. at 6-8). The plaintiffs, in reply, argue that there is no proof that the PLRA even applies to the May Estate but, assuming *arguendo* that it does, they claim that this defense has been waived, both as to the May Estate and the class it represents (Pls.' Reply at 7,

13, 15). The plaintiffs, however, do not assume applicability of the PLRA to Messrs. Dates and Kyles, arguing that the PLRA cannot apply to them because they were not detainees at the time they joined the lawsuit (*i.e.*, filed their claims).

The PLRA provides, in relevant part, that:

> no action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

*42 U.S.C. § 1997e(a)*. The PLRA defines a "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law . . ." *42 U.S.C. § 1997e(h)*. The term "prison conditions" has also been **[*17]** held to include "complaints about medical treatment in prison." *Perez, 182 F.3d 532, 534 (7th Cir. 1999)* (citing *McCarthy v. Bronson, 500 U.S. 136, 114 L. Ed. 2d 194, 111 S. Ct. 1737 (1991))*. A prisoner's failure to exhaust administrative remedies before filing a claim constitutes an affirmative defense under *Rule 8(c) . . . ." Massey v. Helman, 196 F.3d 727, 735 (7th Cir. 2000)*("Massey I"). Because the PLRA's exhaustion requirement is an affirmative defense, defendants have the burden of pleading and proving the defense. *Id.*

We believe the plain language of the PLRA shows that the exhaustion requirement does not apply to Messrs. Kyles and Dates. The PLRA's exhaustion requirement applies only to one "confined in any jail, prison or other correctional facility." The Seventh Circuit has held that as used in the PLRA, the term "prisoner" does not "comprehend a felon who has been released." *Kerr v. Puckett, 138 F.3d 321, 323 (7th Cir. 1998)*. In *Kerr*, the Seventh Circuit held that as used in the PLRA, the PLRA physical injury requirement does not apply to one who is not a "prisoner" at the time suit is brought. **[*18]** We believe this same principle applies to the exhaustion requirement. Since Messrs. Kyles and Dates were not "prisoners" at the time they joined the Fourth Amended Complaint, the exhaustion requirement of the PLRA does not apply to them and thus presents no impediment to Messrs. Kyles and Dates pursuing this action.

The analysis is more complicated as to the May Estate, because Mr. May was in confinement at the time he filed suit in January 1999. The fact that he was not in confinement more than two years later, when the Fourth Amended Complaint was filed, is not a basis to avoid the PLRA's exhaustion requirement; the applicability of the PLRA exhaustion requirement is assessed at the time suit

is commenced, and not when the complaint might later be amended. *See Perez, 182 F.3d at 535* (stating that "no action may be *commenced*" and "no action shall be brought" without satisfying the exhaustion requirement) (emphasis added); *see also Kerr, 138 F.3d at 323* (recognizing that the "court must determine the prisoner's status on the date the suit or appeal is 'brought' rather than at some other time"). However, for the reasons that follow, the Court holds **[*19]** that the PLRA does not bar the May Estate from pursuing this action.

1. Waiver.

The Seventh Circuit has recognized that a defendant "may waive or forfeit reliance on *§ 1997e(a)*, just as they may waive or forfeit the benefit of a statute of limitations." *Perez, 182 F.3d at 536*. Like a statute of limitations, the PLRA exhaustion requirement is a non-jurisdictional prerequisite to suit that can be waived where the defendants do not raise the defense in a timely manner. *See Gibson v. West, 201 F.3d 990, 993 (7th Cir. 2000); Carr v. O'Leary, 167 F.3d 1124, 1126 (7th Cir. 1999)* ("normally the failure to plead a defense in a timely fashion is a waiver"). In this case, the Court believes that a strong case is to be made that defendants have waived their PLRA exhaustion defense as to the May Estate.

In response to Mr. May's original complaint, the defendants filed a motion to dismiss on the grounds of qualified immunity, which was denied by the district court -- a denial later affirmed by the Seventh Circuit. *May v. Sheahan, 226 F.3d 876, 884 (7th Cir. 2000)*. While the motion to dismiss was pending in the district court, **[*20]** Mr. May filed an amended complaint, which Mr. Sheahan answered (doc. # 20). Neither on the motion to dismiss nor in the answer did Mr. Sheahan assert failure to exhaust as a bar to Mr. May's suit.

The defendants did not raise the PLRA exhaustion issue until their response to the motion for class certification, which they filed on August 22, 2001: more than two and one-half years after this case commenced. During that extended period, the parties have engaged in discovery, and have litigated a motion to dismiss both in the district court and in the Seventh Circuit. Defendants have offered no explanation for failing to raise this defense earlier, even though the answer to the amended complaint filed in 1999 raised other affirmative defenses. And, given the frequency with which defendants assert the PLRA exhaustion defense in prisoner litigation, the Court will not assume that the defendants' failure to do so here was mere oversight as opposed to a strategic decision (such as, a desire to obtain a judicial determination that the challenged policies are constitutional or, if not, at least does not involve "clearly established" rights and thus fall within the protection of qualified immunity).

[*21] Having obtained district court and Seventh Circuit opinions on those subjects that are not to their liking, we do not believe that defendants should be entitled now to assert a defense that they could have raised long ago.

We are mindful that plaintiffs have filed a Fourth Amended Complaint, and that the filing of a new complaint typically "wipes away prior pleadings" and thus "opens the door for defendants to raise new and previously unmentioned affirmative defenses." *Massey I, 196 F.3d at 735.* But that principle is inapplicable here, because even though defendants argue the exhaustion requirement in their opposition to class certification, they do not plead that affirmative defense in their answer to the Fourth Amended Complaint, even though they assert eight other affirmative defenses. As with the failure to raise this affirmative defense in the original answer, we conclude that defendants' failure to raise it in their answer to the Fourth Amended Complaint cannot be chalked up to inadvertence -- a conclusion which we believe is further supported by the fact that defendants filed this answer on October 16, 2001, during the pendency of this class certification motion. [*22] Thus, we believe that the defendants have waived any exhaustion defense they otherwise might have had in this case. [3]

> 3 In the event that defendants seek leave to amend their answer to raise that affirmative defense, we would recommend that the district judge deny such a request. Any effort at this late date to assert the defense would be the product of undue delay, as there is no good reason the defense could not have been raised earlier. Moreover, that delay resulted in two types of prejudice. Allowing the belated assertion of the defense plainly would prejudice the May Estate -- Mr. May is now deceased and thus cannot exhaust any available grievance procedure and refile his claim, as he might have done had the affirmative defense been timely asserted. Defendants' conduct also would cause prejudice to the judicial system. If the exhaustion argument were meritorious, then defendants would needlessly have caused the two courts to address the qualified immunity defenses on the constitutional claims, without first exploring the exhaustion requirement.

> Moreover, we note that even if defendants were allowed to belatedly raise the defense, in the Court's view it would not affect the class certification question. *First,* even if raised now, the exhaustion requirement could not be addressed on a motion to dismiss. *Federal Rule of Civil Procedure 12(g)* prevents a party who has made a motion to dismiss without raising an available de-

fense to assert that defense in a subsequent motion to dismiss. *Second,* while defendants argue that Mr. May did not exhaust prison grievance procedures, they have offered no evidence of the existence of such a procedure or, if one exists, that this procedure is capable of providing some relief in response to a complaint about the conditions of hospitalization challenged here. The availability and efficacy of a grievance procedure are part of defendants' affirmative defense under *Section 1997e(a),* which they have the burden of proving. And, while a plaintiff may not forego the process merely because it does not provide his preferred relief, *see Booth v. Churner, 532 U.S. 731, 149 L. Ed. 2d 958, 121 S. Ct. 1819, 1825 (2001),* by the same token a plaintiff need not resort to an administrative procedure that "lacks authority to provide any relief or to take any action whatsoever in response to a complaint." *Booth, 121 S. Ct. at 1822* and n.4; *see also Larkin v. Galloway, 266 F.3d 718, 2001 WL 1117476,* at *3; *Perez, 182 F.3d at 538.* Thus, even if the exhaustion defense were available to defendants on Mr. May's claim, they would have the burden of proving that there is an administrative process that would be able to take action in response to complaints about the challenged conditions of hospitalization -- action, that is, other than saying, "Sorry, we can't do anything about it."

[*23] 2. Vicarious Waiver as to Class.

Having found that the defendants waived the PLRA defense as to the May Estate, the question still remains (although the parties do not raise or brief it for us) whether the defense can be vicariously waived as to the putative and future class members that the May Estate seeks to represent. Although the parties have not provided us with any cases directly addressing this issue, and we have not found any, the Court thinks there are grounds for finding vicarious waiver of the PLRA defense as to the class.

There are strong analytical analogies between a vicarious waiver of the PLRA's exhaustion requirement and the doctrine of "vicarious exhaustion of administrative remedies" which has been recognized in the Title VII context. *See Hartman v. Duffey, 319 U.S. App. D.C. 169, 88 F.3d 1232, 1235 (D.C. Cir. 1996)* (doctrine of "vicarious exhaustion of administrative remedies" applies when one member of a class satisfies the exhaustion requirement for all others with sufficiently similar grievances). The Court believes that the doctrine of vicarious exhaustion should apply to claims of waiver, creating a "vicarious waiver" of the exhaustion [*24] requirement in the class certification context. The vicarious exhaus-

tion theory has been applied in the Title VII context to class claims where the named plaintiff has satisfied the administrative exhaustion prerequisites of that statute. *Duffey, 88 F.3d at 1235* (citing *Foster v. Gueory, 211 U.S. App. D.C. 89, 655 F.2d 1319, 1322-23 (D.C. Cir. 1981)).* In those cases, courts have held that there is no need for every member of the putative (or future) class to individually exhaust their remedies where the claims of each class member otherwise meet the requirements of *Rule 23*, since it was reasonable to presume that the results encountered by the class representative at the administrative level would be the same results attendant to class members with similar claims. The Court sees no reason in this case why this analysis should not apply equally to claims under the PLRA. *See generally Doe v. Cook County, 1999 U.S. Dist. LEXIS 18191,* No. 99 C 3945, 1999 WL 1069244, * 3, n.5 (N.D. Ill., Nov. 22, 1999) (raising question whether doctrine of vicarious exhaustion viable in PLRA context under *Duffey*).

Taking the next step, we also believe that there is no reason why **[\*25]** this doctrine should not apply where the "exhaustion" has occurred by the defendants waiving the requirement. If the named plaintiff may proceed as the class representative in that status, why then should the class he represents not also proceed without exhaustion? It is certainly the case under *Duffey* that the individual class members do not need to exhaust when the class representative has exhausted; and under the same rationale, it makes sense to hold that a waiver of the PLRA exhaustion requirement as to the class representative is a waiver as to all putative class members.

This theory finds support in *Duffey*, albeit in a different procedural context. There, the court of appeals found that certain class members could intervene without having individually exhausted their administrative remedies, not only under the theory of vicarious exhaustion, but also because the defendants had failed to raise the exhaustion defense in a previous appeal. The court therefore found that the exhaustion defense had been waived, in part because it came too late in the day (wasting judicial resources in its wake). The court noted that "by arguing the exhaustion point at the appropriate (much **[\*26]** earlier) juncture, the [defendant] could perhaps have undone certification at one stroke." *88 F.3d at 1236.*

Based on the foregoing analysis, we recommend that the PLRA defense be deemed waived not only as to the May Estate but also as to the class members he represents.

3. The Physical Injury Requirement.

The defendants also argue that *Section 1997e(e)* of the PLRA "prohibits prisoners from filing suit for any alleged mental or emotional injury without a prior show-

ing of a physical injury" (Defs.' Resp. at 8). *Section 1997e(e)* of the PLRA provides:

> No Federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

*42 U.S.C. § 1997e(e) (2001).* The defendants correctly point out that under *Section 1997e(e)*, prisoners who do not claim physical injury cannot recover alleged damages for mental or emotional injury. *Zehner v. Trigg, 133 F.3d 459, 461 (7th Cir. 1997).* But this requirement presents no bar to class certification for three reasons.

*First*, the Supreme Court **[\*27]** has clearly established that "the prohibitive feature of *Section 1997e(e)*, requiring physical injury before recovery, does not apply in the context of requests for declaratory or injunctive relief sought to end an allegedly unconstitutional condition of confinement." *Herman v. Holiday, 238 F.3d 660, 665 (5th Cir. 2001)* (citing *Helling v. McKinney, 509 U.S. 25, 34, 125 L. Ed. 2d 22, 113 S. Ct. 2475 (1993)).* Thus, under no circumstances would *Section 1997e(e)* bar certification of a class for declaratory and injunctive relief.

*Second*, controlling case law holds that this physical injury requirement does not apply to Messrs. Dates and Kyles, who were not prisoners when they filed suit. *See Kerr, 138 F.3d at 322-23; see also Harris v. Garner, 216 F.3d 970, 973 (11th Cir. 2000).* Thus, under no circumstances would *Section 1997e(e)* bar Messrs. Dates and Kyles from proceeding in this case or from representing a class seeking damages.

*Third*, the Fourth Amended Complaint in fact alleges that each named plaintiff suffered "physical injury." For example, the May Estate claims that the challenged practices impeded Mr. **[\*28]** May's "*physical and emotional recovery*," and caused him to "suffer[] prolonged and unnecessary *physical pain* and emotional turmoil (Fourth Am. Compl., Count III, P 33) (emphasis added). The PLRA does not define "physical injury." In the absence of a governing Seventh Circuit authority, we follow the approach in *Gomez v. Chandler, 163 F.3d 921, 924 (5th Cir. 1999)*, and apply the physical injury standard used in excessive force cases: the injury "must be more than *de minimis*, but need not be significant." *Id.,* quoting *Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997)).* At the pleading stage, plaintiffs' allegations are enough to meet the requirement of *Section 1997e(e).*

IV.

To certify a class under *Rule 23*, a plaintiff must satisfy all four elements of *Rule 23(a)*. If each of these elements are satisfied, then the plaintiff must satisfy one of *Rule 23(b)*'s requirements. *See Jefferson v. Security Pacific Financial Services, 161 F.R.D. 63, 67 (N.D. Ill. 1995); Chandler v. Southwest Jeep-Eagle, Inc., 162 F.R.D. 302, 306 (N.D. Ill. 1995)*. A party seeking class certification bears the burden [*29] of proving that each of these requirements under *Rule 23* has been met. *General Telephone Co. v. Falcon, 457 U.S. 147, 162, 72 L. Ed. 2d 740, 102 S. Ct. 2364 (1982)*. Failure by the plaintiff to satisfy any one of these prerequisite elements precludes certification. *Retired Chicago Police Assoc. v. City of Chicago, 7 F.3d 584, 596 (7th Cir.1993)*. However, if the plaintiff seeking certification satisfies the burden of showing that the certification requirements are satisfied, then the court must certify the proposed class. *General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 161, 72 L. Ed. 2d 740, 102 S. Ct. 2364 (1982)*. "The court maintains broad discretion to determine whether a proposed class satisfies the requirements and should err in favor of maintaining class actions." *Guillory v. The American Tobacco Co., 2001 U.S. Dist. LEXIS 3353, No. 97 C 8641, 2001 WL 290603, *2 (N.D. Ill. March 20, 2001) (citing Patterson v. General Motors Corp., 631 F.2d 476, 480 (7th Cir. 1980))*.

To determine whether the requirements of *Rule 23(a)* and *(b)* have been satisfied, the Court must examine the factual basis for a plaintiff's claims. When [*30] making that factual inquiry, the Court must reconcile two lines of authority that, while perhaps facially at odds, are indeed in harmony.

The Supreme Court has made it clear that the propriety of class certification is a separate issue from whether the plaintiff will ultimately prevail on the merits of certain claims. *Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177, 40 L. Ed. 2d 732, 94 S. Ct. 2140 (1974)* ("nothing in either the language or the history of *Rule 23* . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action"). A meritorious claim may be denied class certification if it does not satisfy *Rule 23*; and, conversely, non-meritorious claims may be resolved adversely to the plaintiffs after a court certifies a *Rule 23* class, resulting in a *res judicata* effect on the class. *See Cowen v. Bank United of Texas, FSB, 70 F.3d 937, 941-42 (7th Cir. 1995)*. Thus, while the "boundary between a class determination and the merits may not always be easily discernible," *Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 599 (7th Cir. 1993)*, [*31] because the Court's certification decision depends on factors "'enmeshed in the factual

and legal issues comprising the plaintiff's cause of action." *id. at 598*, it nonetheless is a boundary that must be respected.

At the same time, the Seventh Circuit recently has commented that unlike a motion to dismiss, where a plaintiff's factual allegations are accepted, "the proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in *Rule 23* and has nothing to recommend it." *Szabo v. Bridgeport Machines, Inc., 249 F.3d 672, 675 (7th Cir. 2001)*. The Seventh Circuit explained, for example, that a court would not be free to accept an allegation of 10,000 class members for purposes of numerosity, in the face of a dispute on that point. *Id., at 676*. The appeals court also explained that where the question of suitability for class treatment overlaps with a question related to the merits, the district judge "must make a preliminary inquiry into the merits." *Id.*

We do not believe that *Szabo* directs district courts to decide class certification questions based [*32] on a preliminary assessment of the ultimate merits of the plaintiffs' claims: to base class certification on a prediction of who will win the case would be at odds with *Eisen*. In our view, the "preliminary inquiry into the merits" discussed in *Szabo* is a more limited one, that has at its focus not the substantive strength or weakness of the plaintiffs' claims but rather the merits of those allegations that bear on the suitability of a case for class treatment under *Rule 23(a)* and *(b)*. It is in this limited sense that the Court assesses the "merits" of plaintiffs' allegations in considering the class certification motion.

A.

"There are two implied prerequisites to class certification that must be satisfied prior to addressing the issues raised by *Rule 23(a)*. First, the class must be sufficiently defined so that the class is identifiable." *Guillory, 2001 WL 290603, at *2 (citing Alliance to End Repression v. Rochford, 565 F.2d 975, 977 (7th Cir. 1977))*. Second, "the named representatives must fall within the proposed class." *Id.*

1. Class Definition.

"A class must be clearly defined so that a Court can determine whether [*33] a particular individual is a member of the proposed class." *Gillory, 2001 WL 290603, at *2 (citing Clay v. American Tobacco Co., 188 F.R.D. 483, 490 (S.D. Ill. 1999))*. "Whether the description of a class is sufficiently definite to permit ascertainment of the class members must be determined on a case-by-case basis." *Alliance to End Repression, 565 F.2d at 977*. "However, the description must not be so broad as to include individuals who are without standing

to maintain the action on their own behalf." *Id.* (citing *Clay, 188 F.R.D. at 490*).

Plaintiffs seek to certify a class on behalf of:

> all Cook County Jail inmates who are, were or will be transferred from the jail to an outside hospital and who are subject to defendant Sheahan's policies regarding hospitalized detainees (*e.g.,* shackling prisoners to bed all day, every day, not allowing prisoners to make phone calls or write letters or have access to family members or attorneys; and in most cases, preventing such prisoners from attending court hearings).

(Pls.' Mem. at 2-5). The plaintiffs argue that this proposed class definition is "sufficiently [*34] precise" (Pls.' Mem. at 5-6). Although the defendants do not make any direct arguments that the proposed definition is too broad, they do argue generally that "while the plaintiffs allege that all potential claimants are, were or will be transferred to outside hospitals, they fail to consider the varying circumstances under which the individuals are being detained" (Defs.' Mem. at 3). In essence, the defendants make the argument that the proposed definition is too broad because it does not make any distinctions between members of the class based on individual histories of criminal or violent activity, and the potential need to shackle and implement other security measures.

The problem with defendants' argument is that their argument rests on distinctions that, based on plaintiffs' allegations, defendants do not make when implementing their policies. Defendants offer no evidence to contradict plaintiffs' assertion that the policies are applied without regard to the individual criminal history or security needs of each hospitalized prisoner. In fact, Mr. Remus's testimony is that the policies are the same for all hospitalized inmates *without regard to* their individual criminal history [*35] or the state's security needs (Pls.' Ex. 2 (Remus Dep. at 5-12, 38-42)). We agree with plaintiffs' argument that defendants' "policies define the class, determine the size of the class, limit the relevant issues of law, and control the operative facts" (Pls.' Reply Mem. at 5). The Court finds that the proposed definition is not too broad given the defendants' alleged choice to implement the policy on a broad basis, without any distinctions made between detainees on the bases defendants now assert are necessary.

However, the proposed class is too broad in a way that defendants do not raise: it would include persons who were subjected to the alleged policies more than two years prior to the filing of this suit. Such a class would

conflict with the two-year statute of limitations that governs claims under *42 U.S.C. § 1983* in this Court. *Wilson v. Garcia, 471 U.S. 261, 280, 85 L. Ed. 2d 254, 105 S. Ct. 1938 (1985)* (holding that *Section 1983* actions are "best characterized as personal injury actions," and thus are governed by applicable state statutes of limitations for such actions); *Pitts v. City of Kankakee, 267 F.3d 592, 2001 U.S. App. LEXIS 20853, 2001 WL 1117290,* [*36] * 4 (7th Cir. 2001) (*Section 1983* actions in Illinois are governed by a two-year statute of limitations). Thus, the class period may not reach back earlier than January 22, 1997 -- two years before Mr. May filed this suit. [4]

> 4   Although not raised by defendants, we do not believe that the request to include in the class future detainees who are subjected to the alleged policies renders the proposed class unmanageable. It is permissible to encompass future members in a class definition, even though the number of future detainees subject to the challenged policy is not certain given that sickness and injury is a variable occurrence. *Hodges v. Public Building Comm'n., 1994 U.S. Dist. LEXIS 15748*, No. 93 C 4328, 1994 WL 603105, * 1 (N.D. Ill., Oct. 31, 1994).

2. Named Representatives.

The Court finds that the named plaintiffs fall within the definition of the proposed class. Each plaintiff named in the Fourth Amended Complaint was incarcerated by CCDC at the time they were admitted to the hospital and subjected [*37] to the defendants' alleged policies. With these requirements satisfied, we now turn to the prerequisites of *Rule 23(a)*.

B.

*Rule 23(a)* requires a plaintiff to establish four elements: numerosity, commonality, typicality and adequacy of representation. Failure to meet any of these four requirements will preclude certification of the class. *Retired Chicago Police Association v. City of Chicago, 7 F.3d 584, 596 (7th Cir. 1993)*. If these prerequisites are satisfied, then the court must determine whether one of the standards of Rule -- *Rule 23(b)(2)* and/or *(3)* -- is met. All four of these prerequisites for class certification under *Rule 23(a)* have been met in this case, as have the requirements of *Rule 23(b)(2)* and *(b)(3)*.

1. Numerosity.

*Rule 23(a)(1)* requires that the class be "so numerous that joinder of all members is impracticable." *Fed. R. Civ. P. 23(a)(1)*. While there is no "bright line" test for numerosity, courts have found this element satisfied where the putative class would number in the range of as

few as 10 to 40. *See, e.g., Swanson v. American Consumer Industries, 415 F.2d 1326, 1333 (7th Cir. 1969)* (40 sufficient); *Riordan v. Smith Barney, 113 F.R.D. 60, 62 (N.D. Ill. 1986)* [*38] (10-29 sufficient). In making the numerosity determination, "the court is entitled to make common sense assumptions." *Keele v. Wexler, 1996 U.S. Dist. LEXIS 3253, 1996 WL 124452, *3 (N.D. Ill.), aff'd, 149 F.3d 589 (7th Cir. 1997); see also Patrykus v. Gomilla, 121 F.R.D. 357, 360 (N.D. Ill. 1988).* Although "the one who asserts the class must show some evidence or reasonable estimate of the number of class members [,] if a plaintiff cannot provide precise numbers, 'a good faith estimate is sufficient [to satisfy the numerosity requirement] where it is difficult to assess the exact class membership.'" *Long v. Thornton Township High Sch. Dist., 205, 82 F.R.D. 186, 189 (N.D. Ill. 1979).* In this case, plaintiffs' uncontradicted assertion that "the alleged class exceeds one thousand" is sufficient to satisfy this requirement (Pls.' Motion P 8).

2. Commonality and Predominance.

*Rule 23(a)(2)* requires the presence of questions of law or fact common to the class. "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of *Rule 23(a)(2).*" *Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992).* If the commonality [*39] requirement of *Rule 23(a)(2)* is satisfied, the Court must then turn to *Rule 23(b)(3)* and determine whether the common questions of fact or law "predominate" over issues affecting individual members. Although the commonality and predominance requirements are separate hurdles that a party seeking to certify a class must overcome, analysis of one element often will dispose of issues common to both requirements. Thus, it is appropriate to analyze the commonality and predominance elements together. *See, e.g., Hoffman v. Grossinger Motor Corp., 1999 U.S. Dist. LEXIS 4172, No. 96 C 5362, 1999 WL 184179, * 3 (N.D. Ill., March 29, 1999); Peterson v. H & R Block Tax Servs., Inc., 174 F.R.D. 78, 82 (N.D. Ill. 1997); Miller v. Wexler & Wexler, 1998 U.S. Dist. LEXIS 1382, No. 97 C 6593, 1998 WL 60798, at *5 (N.D. Ill., Feb. 6, 1998).*

Under *Rule 23(a)(2)*, "questions of law or fact common to the class" must exist before a class may be certified. A plaintiff may ordinarily satisfy the commonality requirement by showing that there is "at least one question of law or fact common to the class." *Arenson v. Whitehall Convalescent and Nursing Home, Inc., 164 F.R.D. 659, 663 (N.D.Ill. 1996)* (citations [*40] omitted). Class certification will not be defeated solely because there are some factual variations among the grievances of the class members. *Keele v. Wexler, 149 F.3d 589, 594 (7th Cir. 1998); Patterson v. General Motors Corp., 631 F.2d 476, 481 (7th Cir. 1980).* Perhaps more importantly here, when a "question of law refers to standardized conduct by defendants toward members of the class, a common nucleus of operative facts is typically presented, and the commonality requirement is usually met." *Von Moore v. Simpson, 1997 U.S. Dist. LEXIS 13791, No. 96 C 2971, 1997 WL 570769, at *3 (N.D. Ill., Sept. 10, 1997)* (internal quotations omitted); *Keele v. Wexler, No. 95 C 3483, 1996 WL 124452 at *4 (N.D. Ill., March 19, 1996), aff'd,149 F.3d 589 (7th Cir.1998); Franklin, 102 F.R.D. 944, 949 (N.D. Ill. 1984)* (citing *Katz v. Carte Blanche Corp., 52 F.R.D. 510, 514 (W.D.Pa.1971))* (finding class certification appropriate where plaintiff challenged city police department's standard method of transporting all arrestees); *Heartland Communications, Inc. v. Sprint Corp., 161 F.R.D. 111 (D.Kan. 1995)* [*41] (granting class certification where the contracts signed by all proposed class members, while not identical, contained virtually the same provision as that challenged by the named class representative); *In re United Energy Corp. v. Solar Power Modules Tax Shelter Invs., 122 F.R.D. 251 (D.Cal.1988)* (finding class certification appropriate where the class claims were primarily grounded on misrepresentations and omissions contained in a common core of documents); *Lessard v. Metropolitan Life Insur. Co., 103 F.R.D. 608 (D.Maine 1984)* (granting class certification where all proposed class members were parties to the same contract and subject to the same standardized conduct by the defendant).

The plaintiffs here have alleged that the defendants' policies are applied uniformly to all prisoners who are hospitalized (*e.g.,* shackling by hand and foot, all day, even when using the restroom; no access to legal information; no transportation to scheduled court appearances; no access to attorneys; and no access to telephone (unless a case worker places a call for the prisoner); and severely restricting visiting privileges). The application of those policies [*42] is common to all class members. The defendants do not offer evidence to challenge this allegation. In fact, Mr. Remus essentially admits that, with one minor exception (the defendants permit court visits for prisoners at the Oak Forest Hospital), the alleged policies are the same for all hospitalized inmates (Pls.' App. 2, at 5-12, 12-18, 30-36 38-42).

Instead, the defendants argue that the Court's focus should not be on the standardized conduct related to *application* of the policies, but rather on the individualized nature of the injuries and damages flowing from these policies (Defs.' Mem. at 4). However, *Rule 23(a)(2)* does not require that the claims be identical, only that they arise from a standardized course of conduct or that they arise from substantially the same legal theories. *Chandler v. Southwest Jeep-Eagle, 162 F.R.D. 302, 308 (N.D. Ill. 1995); Johns v. DeLeonardis, 145 F.R.D. 480, 483 (N.D. Ill. 1991).* The plaintiffs' allegations of standard-

ized conduct, together with Mr. Remus's testimony, is sufficient to satisfy *Rule 23(a)(2)*'s commonality requirement. We also find the predominance requirement of *Rule 23(b)(3)* satisfied by the **[\*43]** allegations of standardized conduct, at least for purposes of liability. As for any individual damages issues that may exist after further discovery, they can be addressed through the creation of subclasses under *Rules 23(b)(3)* and *23(c)(4)(B)*. [5]

> 5 Many courts have recognized that where the liability issues involve standardized conduct that "predominates over any questions affecting only individual members" any individual issues related to damages can be adequately dealt with under *Rule 23(b)(3)* through the use of subclasses, as authorized by *Rule 23(c)(4)(B)*. *BJustrom v. Trust One Mortgage Co., 199 F.R.D. 346, 351 (W.D. Wash. 2001)*. It is not the Court's obligation to create such subclasses sua sponte. *Geraghty, 445 U.S. at 407-08*. Rather, that the Supreme Court has clearly held that the plaintiff has the opportunity and burden of proposing and constructing subclasses that will make the disposition of any individual damages "fair and efficient" under *Rule 23(b)(3)*. *Id. at 407*.

**[\*44]** 3. Typicality.

*Rule 23(a)(3)* requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp. Inc., 713 F.2d 225, 232 (7th Cir. 1983)* (internal quotations omitted). Therefore, the typicality prong "may be satisfied even if there are factual distinctions between the claims of the named plaintiff's and those of the other class members." *Id.* The key to typicality is based on the relationship between the class representative and the class members: are the named plaintiff's interests aligned with those of the proposed class in such a way that the representative, in pursuing his own claims, will also advance the interest of the class. *Guillory v. The American Tobacco Co., 2001 U.S. Dist. LEXIS 3353, No. 97 C 8641, 2001 WL 290603, 3 (N.D. Ill., March 20, 2001)* (citing *In re American Med. Sys., Inc., 75 F.3d 1069, 1082 (6th Cir. 1996))*.

In this case, the defendants **[\*45]** contend that plaintiffs' claim of typicality is defeated by "the variety of circumstances under which the putative members are allegedly being injured." These varied circumstances, according to defendants, mean that "the three named plaintiffs cannot adequately represent the interests of the

purported class members" (Defs.' Resp. at 4). This is a rehash of the same argument we rejected under *Rule 23(a)(2)*, and we reject it under *Rule 23(a)(3)* for the same reasons.

The named plaintiffs' claims are typical of those of the putative class members because the same set of policies and practices are allegedly applied to both the named plaintiffs and the proposed class members in the same way -- regardless of individual criminal history or other considerations. In other words, both the named plaintiffs and the class they seek to represent were subjected to the "same event or practice or course of conduct" by the defendants. In general, the facts necessary to satisfy the commonality and typicality requirements are "closely related." *Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992)*. This is certainly true in this case, and this similarity "compels a finding" that both **[\*46]** requirements have been met. *Buycks-Roberson v. Citibank Fed. Savings Bank, 162 F.R.D. 322, 333 n. 13 (N.D. Ill. 1995)*. Thus, we find the typicality requirement satisfied, with the same caveat noted for commonality -- namely, that subclasses may need to be created for purposes of a monetary damages phase.

4. Adequacy of Representation.

To be an adequate representative, a plaintiff must have a sufficient stake in the outcome to ensure zealous advocacy, and must not have antagonistic or conflicting claims with other class members; moreover, counsel for the named plaintiff must be experienced, qualified, and generally able to conduct the litigation. *Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 598 (7th Cir. 1993)*. The class representative must also have the same interest as the other class members in establishing the claims alleged against the defendant in the case. *Hoffman,* 1999 WL 184179, at \*5.

The defendants do not challenge the adequacy of the named plaintiffs or their counsel. Although the issues of standing, exhaustion and the injury requirement under the PLRA are arguably issues related to the named plaintiffs' **[\*47]** adequacy to represent a class, the defendants have not linked these issues to the adequacy of the named plaintiffs as class representatives. In any event, for the reasons outlined in the preceding sections, the Court finds the named plaintiffs may represent a *Rule 23(b)(2)* and a (b)(3) class.

C. *Rules 23(b)(2)* and (b)(3).

Having satisfied *Rule 23(a)*, the next question is whether plaintiffs have met the requirements of *Rules 23(b)(2)* and (b)(3). *Rule 23(b)(2)* permits certification of a class if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or cor-

responding declaratory relief with respect to the class as a whole." *Rule 23(b)(2)* is generally "invoked in cases where injunctive or declaratory relief is the primary or exclusive relief sought." *Buycks-Roberson v. Citibank Fed. Sav. Bank, 162 F.R.D. 322, 335 (N.D. Ill. 1995).* A court considering *Rule 23(b)(2)* certification must find that the injunctive or declaratory relief is "primary" or "exclusive," because *Rule 23(b)(2)* certification creates "binding litigation on all class members without guarantees of personal **[*48]** notice and the opportunity to opt out of the suit." *Lemon v. International Union of Operating Engineers, Local No. 130, 216 F.3d 577, 580 (7th Cir. 2000).*

This non opt-out restriction is imposed on the

> presumption that the interests of the class members are cohesive and homogeneous such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among the class members. A suit for money damages, even if the plaintiffs seek uniform, class wide equitable relief as well, jeopardizes that presumption of cohesion and homogeneity because individual claims for compensatory or punitive damages typically require judicial inquiry into the particularized merits of each individual's claim.

*Lemon, 216 F.3d at 580.* Thus, class certification of claims seeking monetary relief is not appropriate under *Rule 23(b)(2)* unless the demand is incidental to the request for equitable relief. *Lemon, 216 F.3d at 580-81* (adopting Fifth Circuit's definition of "incidental" as "damages that flow directly from liability to the class as a whole on the claims forming **[*49]** the basis of the injunctive or declaratory relief" or damage claims that do not depend "in any significant way on the intangible, subjective differences of each class member's circumstances" and do not "require additional hearings to resolve the disparate merits of each individual's case").

That is not our case. Here, for the reasons explained above, Messrs. Dates and Kyles cannot prosecute a claim under *Rule 23(b)(2)* for declaratory or injunctive relief since they were not prisoners when they joined this suit. Moreover, the damage claims of the May Estate, while not predominant, cannot be said to be merely incidental to the Estate's claims (or the claims of the class it seeks to represent) for injunctive and declaratory relief. We expect that the compensatory damage claims of individual class members may require individual determina-

tions, since any harm caused by defendants' alleged policies likely would fall more heavily on some plaintiffs than on others.

Thus, despite the defined set of standardized policies that the defendants admittedly enforce against all hospitalized prisoners, the non-incidental nature of the damage claims makes this case a difficult fit for class certification **[*50]** under *Rule 23(b)(2)*. One way that *Rule 23(b)(2)* could be used here is if the Court were to require personal notice and an opportunity to opt out for all putative class members (thereby satisfying due process concerns), pursuant to *Rule 23(d)(2)* and *(d)(5)*, "as though the class was certified under *Rule 23(b)(3)*." *Lemon, 216 F.3d at 580.* Although the Seventh Circuit has recognized a *Rule 23(b)(2)* "opt out" class as a valid method for certifying classes in cases like ours, this Court recommends that the district court "opt" for certification under *Rule 23(b)(3)* instead. [6] Here is why.

> 6 In *Lemon,* the Seventh Circuit outlined "three alternatives" for handling a case where there is a standardized policy being challenged and injunctive and/or declaratory relief is sought, but where there are also claims for monetary damages that are not incidental to the requested equitable relief. The first option is certification under *Rule 23(b)(3)* for both the equitable and damages claims with mandatory notice and opt-out for all class members. A second option is certification under *Rule 23(b)(2)* with personal notice and an opportunity to opt-out for all class members. As explained more fully above, this Court chooses the first option because it is both the most simple and the most compatible with the facts of this case.

> A third option is "divided certification," which establishes a *Rule 23(b)(2)* class for injunctive and declaratory relief only (without notice and opt-out requirements), and a *Rule 23(b)(3)* class for damages only. The Court does not recommend the "divided certification" approach because here we do not have separately defined classes to certify for purposes of equitable versus monetary relief -- one reason (and perhaps the only one) we can see for adopting that divided approach.

**[*51]**

*Rule 23(b)(3)* permits class certification when "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." This rule

requires two findings: predominance of common questions over individual ones and superiority of the class action mechanism.

The Court has already found that the predominance requirement has been satisfied by the standardized policies allegedly enforced against the named plaintiffs and putative class members alike. On the issue of whether a class action is superior to other available methods of adjudication, the Court considers the following factors, as required by *Rule 23(b)(3)*: (a) the interest of the members in the class individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against the members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in a particular forum; and (d) the difficulties likely **[*52]** to be encountered in the management of a class action.

In this case, each of those factors support certification. The damage claims are likely to be individually small; thus, providing one action in which they all may be addressed advances an underlying purpose of the class action vehicle. Given that the predominant focus of this case involves injunctive and declaratory relief for a standardized policy and/or practice, certification of a class action provides the most fair and efficient way to adjudicate numerous individual claims that could be filed seeking the same relief. Any difficulties of managing this case on a class basis are likely to be encountered (if at all) on the damages side, and can be adequately addressed through the use of subclasses under *Rule 23(c)(4)(B)*, or bifurcation under *Rule 23(d)(2)*. [7]

> 7 While individual determinations may be needed for actual damages, that may not be the case as to punitive damages. While the issue of punitive damages normally requires individual determinations related to the facts of plaintiff's individual circumstances and whether "the defendant possessed a reckless indifference to the plaintiff's federal rights," *Lemon, 216 F.3d at 581* (citing *Kolstad v. American Dental Ass'n, 527 U.S. 526, 144 L. Ed. 2d 494, 119 S. Ct. 2118 (1999)*), the Court can envision class treatment of such a claim where -- as here -- the policy at issue allegedly is applied without regard to individual circumstances and in a broad-based, systematic way. In analogous situations, courts have certified classes for purposes of litigating punitive damages. *See, e.g., In re Fibreboard, 893 F.2d 706, 708, 712 (5th Cir. 1990)* (upholding certification under *Rule 23(b)(3)* of a class in asbestos litigation for determination of certain liability issues and punitive damages); *see also In Re*

*"Agent Orange" Product Liability Litigation, 100 F.R.D. 718, 728 (E.D.N.Y. 1983)* (certified class for punitive damages under *Rule 23(b)(1)(B)*).

The Court is mindful that the Seventh Circuit has held that "the right to punitive damages is a right of the individual plaintiff, rather than a collective entitlement of the victims of the defendant's misconduct," a proposition that the appeals court drew from the rule that a "plaintiffs award of punitive damages is not limited by awards made to previous plaintiffs complaining of the same act of the defendant." *In Re Brand Name Prescription Drugs, 123 F.3d 599, 608-09 (7th Cir. 1997)*. However, the Seventh Circuit acknowledged that this rule "may have to be qualified" in light of the Supreme Court's decision in *BMW of North America, Inc. v. Gore, 517 U.S. 559, 134 L. Ed. 2d 809, 116 S. Ct. 1589, (1996)*, which held that excessive punitive damages awards violate due process. *123 F.3d at 609*. The Seventh Circuit reasoned that "a piling on of awards by different courts for the same act might result in excessive punishment for that act." *Id.*

The same reasoning would apply to the seriatim punitive damages awards by the same court in individual damages hearings in a class action. To the extent that due process places a limit on the amount of punitive damages that can be awarded against a defendant in a class action, fairness would suggest that all class members affected by the conduct share in that amount equitably rather than have the identity of those class members who might receive punitive damages turn on the fortuity of whose hearings proceeded first (before the due process limit is reached). *Rule 23(b)(1)(B)* seems suited to avoiding this latter result, as it authorizes certification to avoid a risk of "adjudicating as with respect to individual members of the class which would as a practical mater be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests."

By these comments, we intend no view on whether punitive damages would or should be awarded in this case. We intend only to point out that this issue, if appropriate for submission to a jury, might be suitable for class treatment.

**[*53]** In light of these considerations, the Court believes a *Rule 23(b)(3)* class is an appropriate vehicle for litigating the claims in this case. Having so found, we see no reason to reconfigure *Rule 23(b)(2)* to provide for the

notice and opt-out right that will be provided anyway under *Rule 23(b)(3)*.

## CONCLUSION

This Court therefore respectfully recommends that the district court grant the plaintiffs' second amended motion for class certification (doc. # 76) and certify following proposed class under *Rule 23(b)(3)* for liability and damages:

> all Cook County Jail inmates who, on or after January 22, 1997, were or are subject to defendants' alleged policies regarding hospitalized detainees (*e.g.*, shackling prisoners to bed all day, every day, not allowing prisoners to make phone calls or write letters or have access to family members or attorneys; and in most cases, preventing such prisoners from attending court hearings). [8]

8 This formulation of the proposed class modifies the definition sought by plaintiffs so as to exclude persons who were subjected to the alleged policies more than two years prior to the filing of this suit, as the claims of any such persons would be barred by the two-year statute of limitations applicable in *Section 1983* cases.

[*54] As part of this recommendation, the Court specifically recommends that the district court find that: (1) plaintiff May has standing to bring his liability claims for injunctive, declaratory and monetary relief and to represent a class under *Rule 23(b)(3)*; (2) plaintiffs Dates and Kyles have standing to bring liability claims for monetary relief only under *Rule 23(b)(3)*; and (3) the defendants have waived their PLRA affirmative defenses as to the May Estate, and that these defenses do not apply to plaintiffs Dates and Kyles, who were not prisoners at the time they filed their claims.

Specific written objections to this report and recommendation maybe served and filed within 10 business days from the date that this order is served. *Fed. R. Civ. P. 72(a)*. Failure to file objections with the district court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. *See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986)*.

**ENTER:**

**SIDNEY I. SCHENKIER**

**United States Magistrate Judge**

[*55] Dated: October 18, 2001



LEXSEE 2006 U.S. APP. LEXIS 32391

**THE HOME DEPOT, INC., Petitioner, v. JOHN M. RICKHER, Respondent.**

**No. 06-8006**

**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

*2006 U.S. App. LEXIS 32391*

**May 22, 2006, Decided**
**May 24, 2006, Filed**

**SUBSEQUENT HISTORY:** Summary judgment granted by, Summary judgment denied by, Class certification denied by *Rickher v. Home Depot, Inc., 2007 U.S. Dist. LEXIS 52336 (N.D. Ill., July 18, 2007)*

**PRIOR HISTORY:** [*1] Before Hon. RICHARD A. POSNER, Circuit Judge, Hon. ANN CLAIRE WILLIAMS, Circuit Judge, Hon. DIANE S. SYKES, Circuit Judge.
*Rickher v. Home Depot, Inc., 2006 U.S. Dist. LEXIS 3233 (N.D. Ill., Jan. 26, 2006)*

**DISPOSITION:** GRANTED and REVERSED.

**COUNSEL:** For THE HOME DEPOT, INCORPORATED, A DELAWARE CORPORATION, Petitioner: George R. Dougherty, GRIPPO & ELDEN, Chicago, IL; Dwight J. Davis, KING & SPALDING, Atlanta, GA USA.

For JOHN M. RICKHER, INDIVIDUALLY AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED PERSONS, Respondent: John G. Jacobs, Jonah Orlofsky, Chicago, IL USA.

**JUDGES:** Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 05 C 2152. John F. Grady, Judge.

**OPINION**

The Home Depot requests permission to appeal the district court's order remanding this case to state court pursuant to the Class Action Fairness Act, *28 U.S.C. section 1453(c)(1).* CAFA's amendment to *section 1332(d)(2)* states that district courts "shall have original

jurisdiction of any class action in which the matter in controversy exceeds . . . $ 5,000,000" and the parties are from different states. (The parties do not dispute that there is diversity.) Home Depot alleges that the district court erred in determining that the amount in controversy [*2] in this case does not exceed $ 5 million. For the following reasons, we grant the petition for permission to appeal and reverse the district court's order remanding this case to state court. We also grant the petitioner's request for leave to file a reply in support of the petition.

Plaintiff John Rickher alleged that Home Depot violated the Illinois Consumer Fraud Act in association with its sale of damage waivers to tool rental customers in Illinois. Rickher sought to represent a class of persons who rented tools or equipment from Illinois Home Depot stores within three years of the date the complaint was filed. Rickher did not request a specific amount of damages, but alleged that he and the class were injured by paying damage waivers that they would not have paid had the charges not been automatically included in the rental charges. Home Depot filed a notice of removal, stating that the amount in controversy exceeded $ 5 million. The court asked for more information, which Home Depot provided. Rickher did not dispute any of Home Depot's allegations in support of federal jurisdiction, and even now does not take a position on the matter.

To meet the amount-in-controversy requirement, [*3] "the removing litigant must show a reasonable" probability that the stakes exceed the minimum." *Brill v. Countrywide Home Loans, Inc. 427 F.3d 446, 449 (7th Cir. 2005); see Smith v. American Gen. Life & Accident Ins. Co., 337 F.3d 888, 892 (7th Cir. 2003).* "The question is not what damages the plaintiff will recover, but what amount is 'in controversy' between the parties." *Brill, 427 F.3d at 448.* "Once the proponent of jurisdiction has set out the amount in controversy, only a 'legal

2006 U.S. App. LEXIS 32391, *

certainty' that the judgment will be less forecloses federal jurisdiction." *Id.; see St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 58 S. Ct. 586, 82 L. Ed. 845 (1938); Gardynski-Leschuck v. Ford Motor Co., 142 F.3d 955 (7th Cir. 1998).* The amount in controversy includes monetary damages, attorney's fees and "the cost a defendant incurs in complying with injunctive relief." *Tropp v. Western-Southern Life Ins. Co., 381 F.3d 591, 595 (7th Cir. 2004)*

Dan McAreavey, Home Depot's director of tool rental operations and merchandising, filed a declaration discussing the amount in controversy raised by Rickher's complaint. McAreavey **[*4]** stated that the amount of Home Depot's revenue from damage waivers in Illinois from March 2002 to the time of his affidavit totaled $ 3.82 million. That amount is not disputed by the parties. The district court properly rejected McAreavey's argument that the entire rental contract could be found void, and Home Depot does not challenge that finding in its petition. Home Depot also alleged that it would incur costs if required to modify its rental agreement program and that it would incur attorney's fees, but did not provide any information regarding the amount of these costs.

Primarily at issue is McAreavey's claim that Home Depot could incur damages of up to $ 1.2 million per year if Rickher successfully prohibits Home Depot from future sales of damage waivers. The district court found that Home Depot had not shown that the entire $ 1.2 million a year was in controversy because Home Depot did not show that it would be enjoined from selling *all* damage waivers. Home Depot argues that it does not have to show that it is likely that an injunction would prohibit all damage waiver sales, but only that the amount of damages is "in controversy" between the parties. As we stated in **[*5]** *Brill,* the defendant must show "what the plaintiff is claiming (and thus the amount in controversy between the parties), not whether plaintiff is likely to win or be awarded everything he seeks." Here, Rickher claimed that Home Depot's sale of damage waivers is "unconscionable" and that the waivers are "of little if any value." If Rickher were to succeed on his claims, it follows that Home Depot would be enjoined from selling the damage waivers; Home Depot has shown by a reasonable probability that this would cost it $ 1.2 million per year. Rickher has not disputed this amount. As a result, more than $ 5 million is "in controversy" between the parties.

Accordingly, we GRANT the petition for permission to appeal and REVERSE the district court's order remanding this case to state court.



LEXSEE 2007 U.S. DIST. LEXIS 84125

**THOMAS SPRINGMAN, individually and on behalf of those similarly situated, Plaintiff, vs. AIG MARKETING, INC., and ILLINOIS NATIONAL INSURANCE COMPANY, Defendants.**

**CIVIL NO. 07-737-GPM**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ILLINOIS**

*2007 U.S. Dist. LEXIS 84125*

**November 14, 2007, Decided**
**November 14, 2007, Filed**

**SUBSEQUENT HISTORY:** Affirmed by *Springman v. AIG Mktg., 2008 U.S. App. LEXIS 7989 (7th Cir. Ill., Apr. 15, 2008)*

**COUNSEL:** **[*1]** For Thomas Springman, individually and on behalf of those similarly situated, Plaintiff: Dennis J. Barton, LEAD ATTORNEY, Jonathan B. Piper, Lakin Law Firm, Generally Admitted, Wood River, IL.

For AIG Marketing, Inc., Defendant: Joseph P. Whyte, LEAD ATTORNEY, Deborah A. Hawkins, Heyl, Royster et al. - Edwardsville, Generally Admitted, Edwardsville, IL.

For Illinois National Insurance Company, Defendant: Deborah A. Hawkins, Heyl, Royster et al. - Edwardsville, Generally Admitted, Edwardsville, IL; Joseph P. Whyte, Heyl, Royster et al. - Edwardsville, Edwardsville, IL.

**JUDGES:** G. Patrick Murphy, United States District Judge.

**OPINION BY:** G. Patrick Murphy

**OPINION**

**MEMORANDUM AND ORDER**

**MURPHY, District Judge:**

This matter is before the Court on the motion for remand to state court brought by Plaintiff Thomas Springman (Doc. 9). For the following reasons, the motion is **DENIED.**

**INTRODUCTION**

Springman filed this action originally in the Circuit Court of the Third Judicial Circuit, Madison County, Illinois, on July 31, 2003. Named as party Defendants in Springman's original complaint were AIG Claim Services, Inc., ("AIG Claim Services") and Illinois National Insurance Company ("Illinois National"). Springman alleged that AIG Claim **[*2]** Services and Illinois National used computer auditing software to execute a scheme of systematic and improper reductions of medical bills for services furnished by health care providers under the medical payments ("Medpay") provisions of property and casualty insurance policies issued or underwritten by Illinois National and affiliated insurance companies. In his original complaint, Springman, an insured under one of the subject policies who alleges that, following medical treatment for injuries sustained in an automobile accident in 2002, payments on his claim on his Medpay coverage were improperly reduced by his insurer, asserted causes of action for breach of contract, unjust enrichment, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, *815 ILCS 505/1-505/12,* and declaratory relief. Springman also sought to represent a class defined as,

> All insured persons, their third party beneficiaries and assignees (*e.g.,* licensed medical providers), who: (a) submitted first-party medical payment claims pursuant to a property or casualty policy issued

by an AIG insurance company; (b) had their claim submitted to AIG Claim Services, Inc.[;] (c) had their claim audited [*3] by bill review and/or claims processing software[;] (d) received or were tendered partial payment but in an amount less than the claimed incurred expense/actual loss[;] and (e) received or were tendered an amount less than the stated policy limits.

Doc. 2, Ex. C (Class Action Complaint) P 2.

On September 19, 2007, Springman moved in state court to amend his complaint to substitute for AIG Claim Services, Inc. as a party Defendant AIG Marketing, Inc. ("AIG Marketing"). On October 19, 2007, the state court granted Springman's motion for leave to file an amended complaint. The same day, AIG Marketing removed the case to this Court, asserting the existence of federal subject matter jurisdiction in this case on the basis of *28 U.S.C. § 1332*, as amended by the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.). Springman in turn has moved for remand of the case to state court on the grounds that, because this case was commenced before the effective date of CAFA, it is not properly removable to federal court under the statute. Although Defendants have not yet filed a response to Springman's motion to remand because the time for [*4] filing such a response has not yet expired, after careful review of Springman's asserted grounds for remand the Court concludes that a response by Defendants is unnecessary to resolution of the motion. Accordingly, the Court now rules as follows.

## DISCUSSION

### A. Legal Standard

In general a defendant may remove from state court to federal court any case over which a federal court would have original subject matter jurisdiction. *See Disher v. Citigroup Global Mkts., Inc., 419 F.3d 649, 653 (7th Cir. 2005), vacated on other grounds, 126 S. Ct. 2964, 165 L. Ed. 2d 947 (2006); Kurz v. Fid. Mgmt. & Research Co., No. 07-cv-709-JPG, 2007 U.S. Dist. LEXIS 80127, 2007 WL 3231423, at *2 (S.D. Ill. Oct. 30, 2007); Southern Ill. Beverage, Inc. v. Hansen Beverage Co., No. 07-CV-391-DRH, 2007 U.S. Dist. LEXIS 76229, 2007 WL 3046273, at *1 (S.D. Ill. Oct. 15, 2007); Cox v. Strauch, Civil No. 07-680-GPM, 2007 U.S. Dist. LEXIS 74630, 2007 WL 2915593, at *2 (S.D. Ill. Oct. 5, 2007).* The defendant has the burden of establishing that an action is removable, and doubts concerning removal must be resolved in favor of remand to state court. *See Brill v. Countrywide Home Loans, Inc., 427 F.3d 446, 448 (7th Cir. 2005); Boyd v. Phoenix Funding Corp., 366 F.3d 524, 529 (7th Cir. 2004); Weese v. Union Carbide Corp., Civil No. 07-581-GPM, 2007 U.S. Dist. LEXIS 73970, 2007 WL 2908014, at *2 (S.D. Ill. Oct. 3, 2007);* [*5] *Fiore v. First Am. Title Ins. Co., No. 05-CV-474-DRH, 2005 U.S. Dist. LEXIS 34348, 2005 WL 3434074, at *2 (S.D. Ill. Dec. 13, 2005). See also Werner v. KPMG LLP, 415 F. Supp. 2d 688, 695 (S.D. Tex. 2006); Ongstad v. Piper Jaffray & Co., 407 F. Supp. 2d 1085, 1088 (D.N.D. 2006); Judy v. Pfizer, Inc., No. 4:05CV1208RWS, 2005 U.S. Dist. LEXIS 40826, 2005 WL 2240088, at *1 (E.D. Mo. Sept. 14, 2005).*

### B. Plaintiff's Motion for Remand

Under CAFA, federal courts have jurisdiction in diversity, with exceptions not at issue here, *see 28 U.S.C. § 1332(d)(3), (d)(4), (d)(5), (d)(9)*, over class actions with one hundred or more class members, *see 28 U.S.C. § 1332(d)(5)(B)*, in which any member of the plaintiff class is a citizen of a state different from that of any defendant, or any member of a plaintiff class or any defendant is a foreign state or a citizen or subject of a foreign state. *See 28 U.S.C. § 1332(d)(2)*. In a class action in which CAFA's requirement of minimal diversity is met, a federal court has jurisdiction if, after aggregating class members' claims, more than $ 5 million, exclusive of interest and costs, is in controversy. *See 28 U.S.C. § 1332(d)(2), (d)(6)*. Class actions [*6] filed in state court that satisfy the jurisdictional prerequisites of CAFA are subject to removal to federal court. *See 28 U.S.C. § 1453(b), (c)*. In this instance, it is undisputed that this is a class action involving one hundred or more class members in which the requisite minimal diversity of citizenship exists: Springman is an Illinois citizen, while AIG Marketing is a Delaware citizen. *See* Doc. 2 P 2, P 3. Similarly, the record shows that an amount in excess of $ 5 million, exclusive of interest and costs, is in dispute. *See id.,* Ex. A (Declaration of Grant Little). The principal issue in contention here, as noted, is whether this action was commenced on or after the effective date of CAFA.

"CAFA is not retroactive and therefore only applies to class actions which are 'commenced on or after the date of enactment' of the statute, February 18, 2005." *Schillinger v. 360Networks USA, Inc., Civil No. 06-138-GPM, 2006 U.S. Dist. LEXIS 31108, 2006 WL 1388876, at *2 (S.D. Ill. May 18, 2006)* (quoting Pub. L. 109-2, § 9, 119 Stat. 4). *See also Coy Chiropractic Health Ctr., Inc. v. Travelers Cas. & Sur. Co., No. 06-cv-678-DRH, 2007 U.S. Dist. LEXIS 52609, 2007 WL 2122420, at *2 (S.D. Ill. July 20, 2007); Roche v. Country Mut. Ins. Co., Civil No. 07-367-GPM, 2007 U.S. Dist. LEXIS 48921, 2007 WL 2003092, at *2 (S.D. Ill. July 6, 2007).* [*7]

The question of when a lawsuit initially is "commenced" for purposes of removal under CAFA is determined by the law of the state where a class action originally was filed. *See Pfizer, Inc. v. Lott*, 417 F.3d 725, 726 (7th Cir. 2005); *Buller Trucking Co. v. Owner Operator Indep. Driver Risk Retention Group, Inc.*, 461 F. Supp. 2d 768, 772 (S.D. Ill. 2006); *In re General Motors Corp. Dex-Cool, No. Civ. MDL-03-1562-GPM, Civ. 05-10008-GPM*, 2006 U.S. Dist. LEXIS 74503, 2006 WL 2818773, at *2 (S.D. Ill. Sept. 27, 2006); *Alsup v. 3-Day Blinds, No. Civ. 05-287-GPM*, 2005 U.S. Dist. LEXIS 19120, 2005 WL 2094745, at **2-3 (S.D. Ill. Aug. 25, 2005). Under the law of Illinois, where this action initially was filed, "[e]very action, unless otherwise expressly provided by statute, shall be commenced by the filing of a complaint." 735 ILCS 5/2-201(a). *See also Del Raine v. Carlson*, 826 F.2d 698, 707 (7th Cir. 1987) (citing *Lawrence v. Williamson Ford, Inc.*, 13 Ill. App. 3d 880, 300 N.E.2d 636, 640 (Ill. App. Ct. 1973)) (under Illinois law, "suit is commenced by filing the complaint[.]"); *Jackson v. Navik*, 17 Ill. App. 3d 672, 308 N.E.2d 143, 145 (Ill. App. Ct. 1974) ("[A]n action is commenced when the complaint is filed . . . and . . . in [*8] situations where the statute of limitations has run in the interval between the filing of the complaint and service of summons, the effect of the statute of limitations is avoided when reasonable diligence is exercised in obtaining service of process[.]"); *Kohlhaas v. Morse*, 36 Ill. App. 2d 158, 183 N.E.2d 16, 19 (Ill. App. Ct. 1962) ("[A] suit is commenced when the complaint is filed even though service is not obtained until after the statutory period."). Thus, this action was commenced for CAFA purposes on July 31, 2003, when, as noted, it was filed originally in the Madison County circuit court.

This is not, however, the end of the matter. The United States Court of Appeals for the Seventh Circuit has recognized that joinder of a new defendant after the effective date of CAFA authorizes removal of an action under the statute, even if the action was commenced before the effective date of the statute. *See Schillinger v. Union Pac. R.R. Co.*, 425 F.3d 330, 333 (7th Cir. 2005) (quoting *Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 749 (7th Cir. 2005)) (noting that "a defendant added after February 18 [2005] could remove because suit *against it* would have been commenced after the effective date" of CAFA) [*9] (emphasis in original); *Knudsen v. Liberty Mut. Ins. Co.*, 411 F.3d 805, 807-08 (7th Cir. 2005) ("If in the future Liberty Mutual Fire Insurance Company should be added as a defendant, it could enjoy a right to remove under the 2005 Act, for suit *against it* would have been commenced after February 18, 2005.") (emphasis in original). These holdings are consistent with the statutory language of CAFA. Under the traditional "unanimity rule" governing removal, all defendants properly joined and served when a case is

removed must consent to the removal. *See Northern Ill. Gas Co. v. Airco Indus. Gases, Div. of Airco, Inc.*, 676 F.2d 270, 272 (7th Cir. 1982); *P.P. Farmers' Elevator Co. v. Farmers Elevator Mut. Ins. Co.*, 395 F.2d 546, 547-48 (7th Cir. 1968); *Yount v. Shashek*, 472 F. Supp. 2d 1055, 1060-61 (S.D. Ill. 2006); *Production Stamping Corp. v. Maryland Cas. Co.*, 829 F. Supp. 1074, 1076 & n.1 (E.D. Wis. 1993). However, 28 U.S.C. § 1453, which, as noted, governs removal under CAFA, provides, in pertinent part, "[a] class action may be removed to a district court of the United States in accordance with [28 U.S.C. §] 1446 . . . by any defendant without the consent of all defendants." 28 U.S.C. § 1453(b). [*10] This statutory provision abolishes the unanimity rule with respect to removal under CAFA. *See Frazier v. Pioneer Ams., LLC*, 455 F.3d 542, 546-47 (5th Cir. 2006) (citing 28 U.S.C. § 1453(b)) ("CAFA . . . eliminated the requirement of unanimity of consent to removal[.]"); *Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 681 (9th Cir. 2006)) ("Section 1453(b) . . . overrides the judge-created requirement that each defendant consent to removal[.]"). *Section 1453* further provides that the prohibition of removal of an action in diversity jurisdiction more than one year after it is commenced set out in 28 U.S.C. § 1446(b), a limitation on removal that normally is strictly enforced, *see Mills v. Martin & Bayley, Inc., Civil No. 05-888-GPM*, 2007 U.S. Dist. LEXIS 70020, 2007 WL 2789431, at **3-5 (S.D. Ill. Sept. 21, 2007), "shall not apply" to removals under CAFA. 28 U.S.C. § 1453(b). *See also Preston v. Tenet Healthsystems Mem. Med. Ctr., Inc.*, 485 F.3d 804, 810 (5th Cir. 2007) (citing 28 U.S.C. § 1453(b)) ("CAFA eliminates the standard requirements of unanimous consent [to removal] among the defendants and the one-year removal deadline.").

Because CAFA abolishes the unanimity rule with respect to removals under the statute, [*11] it also of necessity abolishes the so-called "first-served defendant" rule. The first-served defendant rule is a corollary of the unanimity rule that holds that a defendant's failure to effect removal within thirty days of receipt of receipt of an initial pleading in a case as required under 28 U.S.C. § 1446(b) operates as a waiver of the right to remove as to all later-served defendants. *See Bova v. U.S. Bank, N.A.*, 446 F. Supp. 2d 926, 932 (S.D. Ill. 2006); *Shepp v. Columbia Coll. Chicago, No. 06 C 1069*, 2006 U.S. Dist. LEXIS 30175, 2006 WL 1156387, at *2 (N.D. Ill. Apr. 27, 2006); *Graft v. Alcoa, No. 1:02-CV-01848-JDT-TA*, 2003 U.S. Dist. LEXIS 7168, 2003 WL 1984347, at **4-5 (S.D. Ind. Apr. 4, 2003); *Higgins v. Kentucky Fried Chicken*, 953 F. Supp. 266, 268 (W.D. Wis. 1997); *Runge v. Maffei, No. 96 C 1666*, 1996 U.S. Dist. LEXIS 4038, 1996 WL 164383, at *2 (N.D. Ill. Apr. 2, 1996); *Scialo v. Scala Packing Co.*, 821 F. Supp. 1276, 1277 (N.D. Ill. 1993); *Ortiz v. General Motors Acceptance Corp.*, 583 F. Supp. 526, 529 (N.D. Ill. 1984). The rationale underly-

ing the first-served defendant rule is that when a defendant who has been properly joined and served fails to effect timely removal, that defendant can no longer consent to removal by later-served defendants as required **[*12]** by the unanimity rule. "[A] removal petition in a multi-defendant case requires the consent of all properly-served defendants . . . . If the first-served defendant allows the time to expire without removing, it has effectively waived its right to remove the action and can be deemed not to have consented to removal by later defendants." *Cox v. Hi-Cube Express, Ltd., No. 1:03-CV-1248-DFH, 2003 U.S. Dist. LEXIS 24226, 2003 WL 23219936, at *2 (S.D. Ind. Dec. 31, 2003)* (citing *Phoenix Container, L.P. v. Sokoloff, 83 F. Supp. 2d 928, 932 (N.D. Ill. 2000)*) (holding that a corporation joined as a party defendant by an amended complaint could not remove an action in diversity jurisdiction, where the original defendant in the case, a subsidiary of the removing defendant, failed to effect timely removal). *See also Auchinleck v. Town of LaGrange, 167 F. Supp. 2d 1066, 1068 (E.D. Wis. 2001)* ("Under [the first-served defendant] rule, the time period [for removal] begins to run when the first defendant has been served, and the failure of any party to file within those thirty days precludes removal for all future defendants. The logic behind this rule is based on the concept that all defendants must consent to removal."); *Joseph v. City of Chicago, No. 88 C 9441, 1989 U.S. Dist. LEXIS 9649, 1989 WL 95813, at *2 (N.D. Ill. Aug. 11, 1989)* **[*13]** (holding that an amendment of a complaint to join additional defendants did not authorize removal, where the initial complaint was removable but the original defendant failed to effect timely removal). *Accord Brown v. Demco Inc., 792 F.2d 478, 482 (5th Cir. 1986); Kuhn v. Brunswick Corp., 871 F. Supp. 1444, 1447 (N.D. Ga. 1994); Faulk v. Superior Indus. Int'l, Inc., 851 F. Supp. 457, 460 (M.D. Fla. 1994); Noble v. Bradford Marine, Inc., 789 F. Supp. 395, 397 (S.D. Fla. 1992); Murjani v. Allstate Ins. Co., 679 F. Supp. 601, 603 n.3 (M.D. La. 1988); Schmidt v. National Org. for Women, 562 F. Supp. 210, 212 (N.D. Fla. 1983). But cf. McKinney v. Board of Trs. of Md. Cmty. Coll., 955 F.2d 924, 926-28 (4th Cir. 1992); Eltman v. Pioneer Communications of Am., Inc., 151 F.R.D. 311, 315-18 (N.D. Ill. 1993).*

In light of CAFA's abolition of the requirement of unanimity, any defendant joined and served after the effective date of the statute is entitled to remove a class action, regardless of whether earlier defendants sought to effect timely removal. *See Kitson v. Bank of Edwardsville, Civil No. 06-528-GPM, 2006 U.S. Dist. LEXIS 85285, 2006 WL 3392752, at *2 & n.1 (S.D. Ill. Nov. 22, 2006)* (because CAFA abolishes the unanimity **[*14]** rule with respect to removal under the statute, "a party defendant joined after the effective date of the statute in a class action that satisfies the jurisdictional prerequisites

of CAFA may remove the case to federal court," with or without the consent of co-defendants that were earlier joined and served); *Schillinger, 2006 U.S. Dist. LEXIS 31108, 2006 WL 1388876, at *7* ("Where the requirement of unanimity is eliminated, so too is the first-served defendant rule . . . . Thus, because the CAFA eliminates the requirement of unanimity, presumably it eliminates the first-served defendant rule as well"); accordingly, a defendant joined after the effective date of CAFA "was entitled to, and did, remove this case within thirty days from the date" the removing party was joined as a defendant). *See also Lowery v. Alabama Power Co., 483 F.3d 1184, 1196 (11th Cir. 2007)* (quoting *28 U.S.C. § 1453(b)*) ("[A] class action removable under CAFA 'may be removed by any defendant without the consent of all defendants' . . . . [T]hese provisions establish that one defendant may remove the entire action, including claims against all defendants, using the procedures established by *§ 1453* and the incorporated provisions of *[28 U.S.C.] § 1446*."); **[*15]** *Robinson v. Holiday Universal, Inc., No. 05-5726, 2006 U.S. Dist. LEXIS 7252, 2006 WL 470592, at *3 (E.D. Pa. Feb. 23, 2006)* (a defendant joined after the effective date of CAFA was entitled to remove under the statute where, at the time of the filing of the notice of removal, "all of the jurisdictional requirements of CAFA were then met[.]"); *Dinkel v. General Motors Corp., 400 F. Supp. 2d 289, 294 (D. Me. 2005)* ("The plain language of CAFA makes clear that any single defendant can remove without the consent of other defendants and that it is the entire lawsuit that is removed[.]"). *Cf. Weese v. Union Carbide Corp., Civil No. 07-581-GPM, 2007 U.S. Dist. LEXIS 73970, 2007 WL 2908014, at *4 (S.D. Ill. Oct. 3, 2007)* (because *28 U.S.C. § 1442*, authorizing removal to federal court of cases against federal officers or persons acting under such officers, does not require unanimity as a prerequisite to removal, any defendant entitled to invoke federal jurisdiction under *Section 1442* may do so within thirty days of receipt of a complaint, without the consent of any co-defendant); *Futch v. AIG, Inc., Civil No. 07-402-GPM, 2007 U.S. Dist. LEXIS 43553, 2007 WL 1752200, at *1 n.1 (S.D. Ill. June 15, 2007)* (same); *Alsup v. 3-Day Blinds, Inc., 435 F. Supp. 2d 838, 842-43 (S.D. Ill. 2006)* **[*16]** (same) (collecting cases).

Springman argues that the removal in this case is improper because the amendment of his complaint to join AIG Marketing relates back to the filing date of his original complaint before the effective date of CAFA. The Court finds this argument unpersuasive in view of the plain statutory language of *28 U.S.C. § 1453* conferring on any defendant joined after the effective date of CAFA a right to remove a class action within thirty days of receipt of a pleading showing that the case is removable under the statute. It is true, of course, that the Seventh Circuit Court of Appeals has held that, in some in-

stances, an amendment of a complaint after the effective date of CAFA may "commence" or, perhaps more properly, recommence a class action so as to make it removable under the statute. In *Knudsen* the court said that "a new claim for relief (a new 'cause of action' in state practice), the addition of a new defendant, or any other step sufficiently distinct that courts would treat it as independent for limitations purposes, could well commence a new piece of litigation for federal purposes even if it bears an old docket number for state purposes." *411 F.3d at 807.* The [*17] court said also that "when a claim relates back to the original complaint (and hence is treated as part of the original suit)," the amendment will not be deemed to permit removal under CAFA, whereas "when [the claim] is sufficiently independent of the original contentions that it must be treated as fresh litigation," it may be regarded as a commencement of the action after the effective date of CAFA so as to permit removal under the statute. *Id.* More recently, the Seventh Circuit Court of Appeals held that for purposes of removal under CAFA "an amended complaint kicks off a new action only if, under the procedural law of the state in which the suit was filed, it does not 'relate back' to the original complaint." *Santamarina v. Sears, Roebuck & Co., 466 F.3d 570, 573 (7th Cir. 2006). See also Phillips v. Ford Motor Co., 435 F.3d 785, 787-88 (7th Cir. 2006)* (in a class action filed in Illinois state court before the effective date of CAFA and removed to federal court on the grounds that an amendment of the complaint after the effective date of the statute commenced a new action so as to permit removal, holding that the amendment related back to the filing date of the original complaint [*18] under Illinois law and therefore did not authorize removal under CAFA).

In the Court's view, Springman is attempting to interpose the federal common law of CAFA crafted by the Seventh Circuit Court of Appeals against the plain language of the statute, a contest in which the plain statutory language inevitably must prevail. It is axiomatic, of course, that "[f]ederal courts, unlike state courts, are not general common-law courts and do not possess a general power to develop and apply their own rules of decision." *City of Milwaukee v. Illinois, 451 U.S. 304, 312, 101 S. Ct. 1784, 68 L. Ed. 2d 114 (1981)* (citing *Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)).* Generally speaking, the object of federal common law is to "fill[ ] a gap left by Congress' silence" with respect to a matter otherwise governed by a federal statute. *Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 625, 98 S. Ct. 2010, 56 L. Ed. 2d 581 (1978). See also D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 469, 62 S. Ct. 676, 86 L. Ed. 956 (1942)* (Jackson, J., concurring) ("[W]herever we have occasion to decide a federal question which cannot be answered from federal statutes alone we may . . . resort to all of the source materials of

the common law [and] when we have fashioned an answer it . . . become[s] a part of the [*19] federal non-statutory or common law."). As Justice Holmes famously observed, federal judges "do and must legislate, but they can do so only interstitially; they are confined from molar to molecular motions." *Southern Pac. Co. v. Jensen, 244 U.S. 205, 221, 37 S. Ct. 524, 61 L. Ed. 1086 (1917)* (Holmes, J., dissenting). *See also United States v. Little Lake Misere Land Co., 412 U.S. 580, 593, 93 S. Ct. 2389, 37 L. Ed. 2d 187 (1973)* ("[T]he inevitable incompleteness presented by all legislation means that interstitial federal lawmaking is a basic responsibility of the federal courts."). Correspondingly, federal common law is "subject to the paramount authority of Congress." *New Jersey v. New York, 283 U.S. 336, 348, 51 S. Ct. 478, 75 L. Ed. 1104 (1931).* Thus, it is resorted to only "[i]n absence of an applicable Act of Congress," *Clearfield Trust Co. v. United States, 318 U.S. 363, 367, 63 S. Ct. 573, 87 L. Ed. 838 (1943),* and federal common law may not be employed for the purpose of "rewriting rules that Congress has affirmatively and specifically enacted." *Mobil Oil Corp., 436 U.S. at 625.* Simply put, "[s]tatutes and rules supersede the common law powers of the federal courts." *Ivey v. Harney, 47 F.3d 181, 184 (7th Cir. 1995).* What all of this means for purposes of this case is that, while the federal courts [*20] of this Circuit are entitled to create a body of federal common law regarding "commencement" of an action under CAFA, given that the term "commencement" is not defined in the statute, the Court may not use this body of common law to rewrite the clear language of the statute. Because *28 U.S.C. § 1453(b)* confers on defendants joined after the effective date of CAFA an express right to remove under the statute, AIG Marketing cannot be stripped of this right by a determination that the amendment of Springman's complaint to join AIG Marketing as a party Defendant relates back to the pre-CAFA filing date of Springman's original complaint. Therefore, the Court declines to remand this case to state court.

## CONCLUSION

For all of the foregoing reasons, Springman's motion for remand of this case to the Circuit Court of the Third Judicial Circuit, Madison County, Illinois, (Doc. 9) is **DENIED.**

**IT IS SO ORDERED.**

DATED: 11/14/07

/s/ *G. Patrick Murphy*

G. Patrick Murphy

United States District Judge

 LexisNexis·

LEXSEE 2006 U.S. DIST. LEXIS 31108

**GEORGE SCHILLINGER and RUTH SCHILLINGER, on behalf of themselves and all others similarity situated, Plaintiffs, vs. 360NETWORKS USA, INC., a/k/a 360Networks, Inc., f/k/a Worldwide Fiber, Inc., f/k/a Pacific Fiber Link, Defendant.**

**CIVIL NO. 06-138-GPM**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ILLINOIS**

*2006 U.S. Dist. LEXIS 31108*

**May 18, 2006, Decided**

**SUBSEQUENT HISTORY:** Motion granted by *Schillinger v. 360Networks USA, Inc., 2006 U.S. Dist. LEXIS 38998 (S.D. Ill., June 13, 2006)*

**COUNSEL:** [*1] For George Schillinger, on behalf of themselves and all others similarly situated, Ruth Schillinger, Plaintiffs: Catherine Colinvaux, Zelle, Hofmann et al. - MA, Generally Admitted, Waltham, MA; Daniel J. Millea, John B. Massopust, Zelle, Hofmann et al., Generally Admitted, Minneapolis, MN; Elizabeth V. Heller, Mark C. Goldenberg, Goldenberg, Miller et al., Edwardsville, IL; Henry J. Price, Price, Potter et al., Indianapolis, IN; Nels Ackerson, Sommer, Barnard et al., Washington, DC; Roger C. Johnson, Koonz, McKenney et al., Washington, DC.

For 360Networks USA Inc., also known as 360Networks Inc formerly known as Worldwide Fiber Inc. formerly known as Pacific Fiber Link, Defendant: Jill R. Sundberg, Troy A. Bozarth, Burroughs, Hepler et al. - Edwardsville, Edwardsville, IL.

**JUDGES:** Patrick Murphy, Chief United States District Judge.

**OPINION BY:** Patrick Murphy

**OPINION**

**MEMORANDUM AND ORDER**

**MURPHY, Chief District Judge:**

This action is before the Court on the Motion to Remand brought by Plaintiffs George Schillinger and Ruth Schillinger on behalf of themselves and all others similarity situated (Doc. 24). For the following reasons, the motion is DENIED.

**INTRODUCTION**

[*2] Plaintiffs, who reside in Madison County, Illinois, originally filed this case in the Circuit Court for the Third Judicial Circuit, Madison County, Illinois, on February 17, 2005. As originally filed in state court, this case is a putative nationwide class action against 360Networks, Inc., claiming the company installed fiber optic telecommunications cable on Plaintiffs' land without permission as part of a telecommunications network. [1] More specifically, Plaintiffs allege that 360Networks, Inc., installed the cable on or next to railroad, pipeline, energy, or other utility companies' rights-of-way which run through their property and that the installation, maintenance, and operation by 360Networks, Inc., of its telecommunications network without Plaintiffs' consent constitute a trespass. Plaintiffs seek a declaratory judgment that 360Networks, Inc., did not obtain from the railroad, pipeline, energy, or other utility companies any title, interest, or right to occupy or use the rights-of-way, that the agreements between 360Networks, Inc., and the railroad, pipeline, energy, or other utility companies create no lawful encumbrance on the rights-of-way, and that 360Networks, Inc. [*3] , has no valid easement, license, or other right of occupancy in the rights-of-way. Additionally, Plaintiffs assert claims for trespass and unjust enrichment, and seek compensatory damages and punitive damages, together with pre-judgment and post-judgment interest and attorneys' fees and costs. [2]

1   Although the notice of removal in this case identifies an American subsidiary of 360Networks, Inc., called 360Networks (USA), Inc., as the named Defendant in the case, in fact, Plaintiffs' original state-court complaint names only 360Networks, Inc., as Defendant.

2   It should be noted that this case is the successor to a case originally filed in this Court, *Schillinger v. 360Networks, Inc.,* Civil No. 01-183-GPM (S.D. Ill. filed Mar. 23, 2001), which was dismissed by the Court for lack of federal subject matter jurisdiction on June 28, 2002.

Since its initial filing, this case has followed a rather tortuous procedural path on its journey to this Court. Plaintiffs served 360Networks, Inc., with their complaint **[*4]** through the registered agent for 360Networks (USA), Inc., an American subsidiary of 360Networks, Inc. On May 13, 2005, 360Networks, Inc., advised the state court that it was involved in bankruptcy proceedings in Canada, the company's place of incorporation. On December 19, 2005, Plaintiffs moved in state court for voluntary dismissal of 360Networks, Inc., from the action pursuant to *735 ILCS 5/2-1009.* At the same time, Plaintiffs filed a motion requesting that the state court enter a proposed scheduling order identifying both 360Networks, Inc., and its American subsidiary, 360Networks (USA), Inc., as parties to the case and directing 360Networks (USA), Inc., to file an answer to Plaintiffs' state-court complaint by a specified date. On January 3, 2006, the state court entered an order dismissing 360Networks, Inc., from the case; however, the state court did not enter Plaintiffs' proposed scheduling order. The clerk of the state court then listed this case as dismissed or terminated and closed the court's file on the case.

On February 9, 2006, counsel for the parties appeared in the state court for a case management conference at which Plaintiffs' counsel **[*5]** again moved for entry of the proposed scheduling order identifying 360Networks (USA), Inc., as a party to the case and directing the company to file an answer to Plaintiffs' state-court complaint by a specified date. The state court did not enter a scheduling order as requested; rather, it entered a default judgment against 360Networks (USA), Inc., pursuant to *735 ILCS 5/2-1301 (see* Doc. 28, Ex. K). Having entered a default judgment against it, the state court necessarily granted Plaintiffs' request that 360Networks (USA), Inc., be identified as a party to the case. On February 15,2006, the case was removed to this Court. Counsel for 360Networks, Inc., contend that the case is subject to removal pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.) ("CAFA"),

because Plaintiffs commenced the case after the effective date of the CAFA by joining a new party Defendant, 360Networks (USA), Inc. Plaintiffs have moved for remand of this action to state court for lack of federal diversity jurisdiction.

## DISCUSSION

### A. Legal Standard

Removal of actions from state court **[*6]** to federal court is governed by *28 U.S.C. § 1441,* which provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." *28 U.S.C. § 1441(a).* In other words, "[a] defendant may remove a case to federal court only if the federal district court would have original subject matter jurisdiction over the action." *Disher v. Citigroup Global Mkts., Inc., 419 F.3d 649, 653 (7th Cir. 2005).* The defendant has the burden of establishing that an action is removable, and doubts concerning removal must be resolved in favor of remand to the state court, *See Brill v. Countrywide Home Loans, Inc., 427 F.3d 446, 448 (7th Cir. 2005); Boyd v. Phoenix Funding Corp., 366 F.3d 524, 529 (7th Cir. 2004); Bemis v. Allied Property & Cas. Ins. Co., 2006 U.S. Dist. LEXIS 21489, No. 05-CV-751-DRH, 2006 WL 1064067, at \*6 (S.D. Ill. Apr. 20, 2006); Fiore v. First Am. Title Co., 2005 U.S. Dist. LEXIS 34348, No. 05-* **[*7]** *CV-474-DRH, 2005 WL 3434074, at \*2 (S.D. Ill. Dec. 13, 2005).*

### B. Requirements of the CAFA

Under the CAFA, federal courts now have jurisdiction, with exceptions not relevant here, over class actions with one hundred or more class members, *see 28 U.S.C. § 1332(d)(5)(B),* in which, after aggregating class members' claims, more than $ 5 million, exclusive of interest and costs, is in controversy, *see id. § 1332(d)(2), (d)(6),* and in which any member of the plaintiff class is a citizen of a state different from that of any defendant, or any member of a plaintiff class, or any defendant, is a foreign state or a citizen or subject of a foreign state, *See id. § 1332(d)(2).* In this case it is not disputed that all of these prerequisites are met. Class actions fitting within the scope of the CAFA are removable in accordance with *28 U.S.C. § 1446. See 28 U.S.C. § 1453(b).* That is, to remove an eligible class action, a notice of removal must be filed within thirty days "after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other **[*8]** paper from which it may first be ascertained that the case is one which is or has become removable." *Id. § 1446(b).*

The CAFA is not retroactive and therefore only applies to class actions which are "commenced on or after the date of enactment" of the statute, February 18, 2005. *See* Pub. L. 109-2, § 9, 119 Stat. 4. It is now well settled in this Circuit that an action is "commenced" for purposes of removal under the CAFA when it is filed in state court, *See Phillips v. Ford Motor Co., 435 F.3d 785, 786 (7th Cir. 2006); Pfizer, Inc. v. Lott, 417 F.3d 725, 726 (7th Cir. 2005), Bemis, 2006 U.S. Dist. LEXIS 21489, 2006 WL 1064067, at *2; Komeshak v. Concentra, Inc., 2005 U.S. Dist. LEXIS 23231, No. 05-CV-261-DRH, 05-CV-349-DRH, 2005 WL 2488431, at **2-3 (S.D. Ill. Oct. 7,2005); Alsup v. 3-Day Blinds, 2005 U.S. Dist. LEXIS 19120, No. Civ. 05-287-GPM, 2005 WL 2094745, at *2 (S.D. Ill. Aug. 25, 2005).* This action, as noted, was filed in state court on February 17, 2005, one day before the effective date of the CAFA.

It is equally well settled that an amendment of a class action complaint in state court to join a new defendant will commence (or, perhaps more properly, recommence) [*9] the action for purposes of removal under the CAFA. In *Knudsen v. Liberty Mutual Insurance Co., 411 F.3d 805 (7th Cir. 2005) ("Knudsen I")*, the court addressed the amendment of class action complaints in state court after the effective date of the CAFA. The court said that "a new claim for relief (a new 'cause of action' in state practice), the addition of a new defendant, or any other step sufficiently distinct that courts would treat it as independent for limitations purposes, could well commence a new piece of litigation for federal purposes even if it bears an old docket number for state purposes." *Id. at 807. See also Schillinger v. Union Pac. R.R. Co., 425 F.3d 330, 333 (7th Cir. 2005)* (quoting *Schorsch v. Hewlett-Packard Co., 417 F.3d 748, 749 (7th Cir. 2005))* ("[A] defendant added after February 18[, 2005] could remove because suit *against it* would have been commenced after the effective date[.]") (emphasis in original). *Cf Dinkel v. General Motor., 400 F. Supp. 2d 289, 293 (D. Me. 2005)* (denying remand when the plaintiffs "commenced" an action against additional defendants after [*10] the enactment of the CAFA); *Adams v. Federal Materials Co., 2005 U.S. Dist. LEXIS 15324, No. Civ.A. 5:05CV-90-R, 2005 WL 1862378, at *4 (W.D. Ky. July 28, 2005)* (holding that a defendant added after the effective date of the CAFA had a right to remove the case to federal court because the action is "commenced" for purposes of the CAFA from the perspective of the newly-added defendant). In *Knudsen I* the court noted that the answer to an inquiry as to whether an amendment has commenced an action so as to make it removable under the CAFA may be "modeled on [*Rule] 15(c)* [of the Federal Rules of Civil Procedure], which specifies when a claim relates back to the original complaint (and hence is treated as part of the original suit) and when it is sufficiently independent of the original

contentions that it must be treated as fresh litigation." *411 F.3d at 807.* However, the weight of authority appears to apply the law of the state where a class action was filed in determining whether an amendment relates back so as to commence the action for purposes of removal under the CAFA.

For example, in *Schorsch* the court, applying state law, concluded [*11] that an amendment of a class action complaint after the effective date of the CAFA did not commence a suit so as to make it removable. After the CAFA was enacted, the plaintiff in the *Schorsch* case, a class action against a manufacturer of drum kits for printers, amended his complaint in Illinois state court to allege that a defective part existed in two additional products manufactured by the defendant, prompting the defendant to remove the case on the grounds that the amendment of the complaint had commenced the case anew for CAFA purposes, *See 417 F.3d at 749-50.* The court noted that "[a]n amendment relates back in Illinois when the original complaint 'furnished to the defendant all the information necessary . . . to prepare a defense to the claim subsequently asserted in the amended complaint.'" *Id. at 751* (quoting *Boatmen's Nat'l Bank of Belleville v. Direct Lines, Inc., 167 Ill. 2d 88, 656 N.E.2d 1101, 1107, 212 Ill. Dec. 267 (Ill. 1995)).* The court held that because the same defective part remained at the heart of the proceeding, this was no more than a "workaday change[] routine in class suits" and was insufficient to constitute commencement of the action [*12] for purposes of the CAFA. *Id.See also Phillips, 435 F.3d at 787-88* (testing whether an amendment of a class action complaint related back to the date of filing of the complaint under the procedural rules of the state where the class action was commenced); *Knudsen v. Liberty Mut. Ins. Co., 435 F.3d 755, 757 (7th Cir. 2006) (Knudsen II)* (same); *Bemis, 2006 U.S. Dist. LEXIS 21489, 2006 WL 1064067, at *4* (same); *In re General Motors Corp. Dex-Cool Prodsw. Liab. Litig., 2006 U.S. Dist. LEXIS 13861, No. CIVMDL-03-1562GPM, Civ. 05-10007-GPM, 2006 WL 644793, at *2 (S.D. Ill. Mar. 9, 2006)* (same); *Boxdorfer v. Daimlerchrysler Corp., 396 F. Supp. 2d 946, 951-52 (C.D. Ill. 2005)* (same). Thus, the issue for the Court to decide is simply whether Plaintiffs joined a new party Defendant, 360Networks (USA), Inc., after the effective date of the CAFA and, if so, whether this amendment relates back to the pre-CAFA filing date of the original complaint in this case. If the amendment relates back, this action was not commenced after the effective date of the CAFA; if it does not, this action has been properly removed to this Court.

**C. Commencement of this Action after [*13] the Effective Date of the CAFA**

The record is clear that 360Networks (USA), Inc., was not joined as a Defendant in the original state-court complaint in this case, and there is no evidence before the Court that Plaintiffs' failure to join the company was the result of a mistake or that the company was on notice within the period for service of the complaint that it might potentially be a party to this lawsuit. The Court concludes that Plaintiffs have joined a new party Defendant, 360Networks (USA), Inc., after the effective date of the CAFA and that this amendment does not relate back to the filing date of the original complaint. Thus, the joinder of 360Networks (USA), Inc., has commenced a new litigation for purposes of removal under the CAFA.

Under Illinois law, a plaintiff is responsible for suing the correct defendant within the relevant statute of limitations, *See Dever v. Simmons, 292 Ill. App. 3d 70, 684 N.E.2d 997, 1002, 226 Ill. Dec. 1 (Ill. App. Ct. 1997).* Illinois law provides that

[a] cause of action against a person not originally named a defendant is not barred by lapse of time under any statute or contract prescribing or limiting the time within which an action may be brought [*14] or right asserted, if all the following terms and conditions are met: (1) the time prescribed or limited had not expired when the original action was commenced; (2) the person, within the time that the action might have been brought or the right asserted against him or her plus the time for service permitted under Supreme Court Rule 103(b), received such notice of the commencement of the action that the person will not be prejudiced in maintaining a defense on the merits and knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him or her; and (3) it appears from the original and amended pleadings that the cause of action asserted in the amended pleading grew out of the same transaction or occurrence set up in the original pleading, even though the original pleading was defective in that it failed to allege the performance of some act or the existence of some fact or some other matter which is a necessary condition precedent to the right of recovery when the condition precedent has in fact been performed, and even though the person was not named originally as a defendant. For the purpose of preserving [*15] the

cause of action under those conditions, an amendment adding the person as a defendant relates back to the date of the filing of the original pleading so amended.

*735 ILCS 5/2-616(d). See also Pruitt v. Pervan, 356 Ill. App. 3d 32, 825 N.E.2d 299, 301, 292 Ill. Dec. 43 (Ill. App. Ct. 2005); Fassero v. Turigliatto, 349 Ill. App. 3d 368, 811 N.E.2d 252, 255-56, 285 Ill. Dec. 11 (Ill. App. Ct. 2004).*

The Illinois statute governing relation back of amendments permits joinder of a defendant where the plaintiff "lack[ed] . . . knowledge of the identity or the existence of the defendant [and] . . . [has] act[ed] with reasonable diligence to add the proper parties after their identities become known." *Siebert v. Bleichman, 306 Ill. App. 3d 841, 715 N.E.2d 304, 307, 239 Ill. Dec. 859 (Ill. App. Ct. 1999).* Conversely, an amendment does not relate back where "the delay in naming the proper defendant" results because "the plaintiff is aware of the defendant's identity . . . but fails to amend the complaint." *Id.* Thus, "[w]hen a plaintiff is aware of the identity of a defendant. . . but does not seek to add that defendant to her complaint . . ., failure to join that defendant is not" the result of a mistake [*16] so as to permit relation back. *Plooy v. Paryani, 275 Ill. App. 3d 1074, 657 N.E.2d 12, 20, 212 Ill. Dec. 317 (Ill. App. Ct. 1995).* Importantly, "[t]here is a distinction between ignorance of law and ignorance of fact. While lack of knowledge about the identity or existence of a defendant is excusable ignorance, lack of knowledge of the law governing the situation is not." *Bigger staff v. Moran, 284 Ill. App. 3d 196, 671 N.E.2d 781, 786, 219 Ill. Dec. 614 (Ill. App. Ct. 1996)* (in a suit against an assistant state's attorney, holding that an amendment of the plaintiffs' complaint to assert a claim against a county state's attorney's office rather than against the county reflected a mistake of law, not fact, so that the amendment did not relate back).

Consistent with the rule that a mistake of law will not support relation back, a mistake as to corporate form generally does not permit an amendment to relate back. "[W]hile genuine confusion weighs in favor of permitting the plaintiff's cause of action to continue, the similarity of corporate structure in and of itself is insufficient to excuse the plaintiff's failure to name a defendant before the expiration of the statute of limitations." *Tatara v. Peterson Serv., 283 Ill. App. 3d 1031, 670 N.E.2d 789, 795, 219 Ill. Dec. 111 (Ill. App. Ct. 1996)* [*17] (although a crane rental company and a contractor's service shared the same parent company, this fact did not excuse the plaintiff from naming the contractor's service as a defendant in a timely fashion). "Complex organization structure, if it causes confusion in ascertaining the cor-

rect defendant, can be a basis for finding inadvertence. The mere fact that businesses set up different entities to conduct their affairs, however, does not justify a finding of [mistake] unless the profusion of such entities causes confusion in identifying the proper defendants." *Dever, 684 N.E.2d at 1003* (citation omitted).

In this case, it is clear that Plaintiffs were aware of the existence of 360Networks (USA), Inc., when they filed their original state-court complaint and that Plaintiffs could have named the company as a Defendant if they chose. Although Plaintiffs insist that when they filed their complaint they believed that 360Networks, Inc., and its subsidiary 360Networks (USA), Inc., were the same entity, it is very difficult to credit this assertion. Plaintiffs undoubtedly knew that 360Networks (USA), Inc., is an active corporation; this apparently is why they chose to try [*18] to effect service of their complaint on its parent through the subsidiary's registered agent for service of process. More to the point, the principle that corporations - even parent corporations and subsidiary corporations - are separate and are rarely liable for the torts of one another is elementary. *See generally* 1 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 43.60(perm. ed., rev. vol. 1999)(collecting cases). *See also Polites v. U.S. Bank Nat'l Ass'n, 361 Ill. App. 3d 76, 836 N.E.2d 133, 137, 296 Ill. Dec. 718 (Ill. App. Ct. 2005)* ("[C]orporations are . . . separate legal entities even where one wholly owns the other and the two have mutual dealings."). [3] In other words, it was not reasonable for Plaintiffs' counsel to assume that 360Networks, Inc., and its subsidiary 360Networks (USA), Inc., are the same entity.

3 Naturally, in citing *Polites* the Court does not suggest that issues concerning the corporate form likely to arise in this proposed national class action are governed by Illinois law. The Court assumes, without deciding, that any such issues would be governed by the law of the places where the class members reside. *See Restatement (Second) of Conflict of Laws § 301 (1971); Id. § 145. See also In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1016 (7th. Cir. 2002)*. The Court cites *Polites* merely to illustrate a settled principle of corporations law.

[*19] This obviously is not a case in which Plaintiffs were confused by a complex corporate structure. Additionally, the Court finds no evidence that 360Networks (USA), Inc., would have been on notice of its potential liability in this case during the period for service of the original state-court complaint. All of the allegations of Plaintiffs' complaint concern alleged wrongdoing by 360Networks, Inc. Notably, the complaint contains no allegations that would support piercing

the corporate veil as between 360Networks, Inc., and related entities. The only summons issued in this case was directed to 360Networks, Inc.; no summons was ever issued regarding 360Networks (USA), Inc. [4] Also, the conduct of 360Networks (USA), Inc., throughout the state-court litigation supports an inference that the company was not on notice of any potential liability. During the year that this case was pending in state court, 360Networks (USA), Inc., never retained counsel and never appeared in the state court.

4 In light of the fact that no summons has been issued in this case as to 360Networks (USA), Inc., it seems highly likely that the Court lacks in personam jurisdiction over the company. *See 735 ILCS 5/2-201; 735 ILCS 5/2-204. See also Fields v. Keith, 174 F. Supp. 2d 464, 483 (N.D. Tex. 2001)* (reviewing the pre-removal service of a complaint on a defendant and finding that, under Texas law, the defendant had not been properly served, and therefore was not under the state court's jurisdiction when the action was removed, and proper service had not been effected after removal pursuant to *Rule 4 of the Federal Rules of Civil Procedure*; thus, the court dismissed the defendant from the case without prejudice for lack of personal jurisdiction). The Court need not decide this issue at this time, *see Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 587-88, 119 S. Ct. 1563, 143 L. Ed. 2d 760 (1999)*, just as the Court expresses no opinion as to whether Plaintiffs effectively served process on 360Networks, Inc., a thoroughly moot question at this stage in this litigation.

[*20] Finally, the uncontroverted evidence of record shows that 360Networks (USA), Inc., does not own fiber optic cable in Madison County, Illinois, where Plaintiffs reside, so that any claim asserted by Plaintiffs against the subsidiary could not arise out of the same claims underlying the initial complaint. *See Morton v. Madison County Nursing Home Auxiliary, 198 Ill. 2d 183, 761 N.E.2d 145, 149-50, 260 Ill. Dec. 301 (Ill. 2001)* (relation back is allowed only when an amended pleading joining a new defendant asserts a claim based on the same transaction or occurrence as the original complaint). To allow relation back under these circumstances "would be to disregard the purpose of a statute of limitations which is 'to afford a defendant a fair opportunity to investigate the circumstances upon which liability against him is predicated while the facts are accessible.'" *Zeh v. Wheeler, 111 Ill. 2d 266, 489 N.E.2d 1342, 1350, 95 Ill. Dec. 478 (Ill. 1986)* (quoting *Geneva Constr. Co. v. Martin Transfer & Storage Co., 4 Ill. 2d 273, 122 N.E.2d 540, 549 (Ill. 1954)*). The Court concludes that Plaintiffs joined a new party Defendant, 360Networks

(USA), Inc., after the effective date of the CAFA, and that this amendment does not relate [*21] back to the filing date of the original complaint, so that the joinder of 360Networks (USA), Inc., commenced this action and made it removable in diversity jurisdiction. [5]

> 5 The Court notes that, although it has tested relation back in this case under Illinois law, the result likely would be the same under federal law as well. *See Phillips, 435 F.3d at 788* (quoting *735 ILCS 5/2-616(b)*) ("Under Illinois law as under federal law, an amendment relates back when it arises out of 'the same transaction or occurrence set up in the original pleading.'"); *Schorsch, 417 F.3d at 751* (stating that the Illinois statute governing relation back of amendments "is functionally identical to *Rule 15(c)*" of the Federal Rules of Civil Procedure).

The same outcome arguably is compelled by the statutory language of *28 U.S.C. § 1453*, which provides, in pertinent part, "[a] class action may be removed to a district court of the United States in [*22] accordance with [*28 U.S.C. §] 1446* . . . without regard to whether any defendant is a citizen of the State in which the action is brought, except that such action may be removed by any defendant without the consent of all defendants." *28 U.S.C. § 1453(b)*. This provision of the CAFA abolishes in class actions subject to the statute the traditional "unanimity rule," that is, the principle that unless all defendants properly joined and served when a case is removed consent to the removal, such removal is procedurally defective. *See Northern Ill. Gas Co. v. Airco Indus. Gases, Div. of Airco, Inc., 676 F.2d 270, 272 (7th Cir. 1982)*; *P. P. Farmers' Elevator Co. v. Farmers Elevator Mut. Ins. Co., 395 F.2d 546, 547-48 (7th Cir. 1968)*; *Production Stamping Corp. v. Maryland Cas. Co., 829 F. Supp. 1074, 1076 & n.1 (E.D. Wis. 1993)*. [6]

> 6 Obviously, in addition to the unanimity rule, *28 U.S.C. § 1453(b)* abolishes in class actions subject to the CAFA the traditional "forum defendant" rule, that is, the rule that removal by a defendant to a federal court in a state of which that defendant is a citizen is procedurally defective, *see Hurley v. Motor Coach Indus., Inc., 222 F.3d 377, 379 (7th Cir. 2000)*, although this aspect of the CAFA has no bearing on the case at hand.

[*23] A corollary of the unanimity rule is the so-called "first-served defendant" rule, which holds that a defendant's failure to remove operates as a waiver of the right to remove as to all later-served defendants. *See Phoenix Container, L.P. v. Sokoloff, 83 F. Supp. 2d 928, 932-33 (N.D. Ill. 2000)*; *Higgins v. Kentucky Fried Chicken, 953 F. Supp. 266, 268 (W.D. Wis. 1997)*; *Ortiz v. General Motors Acceptance Corp., 583 F. Supp. 526, 529 (N.D. Ill. 1984)*. The rationale of the first-served defendant rule is that when a defendant who has been properly joined and served fails to effect timely removal, the defendant can no longer consent to removal by later-served defendants. "When the first defendant allows the thirty-day period to lapse, he has effectively waived his consent to removal. Therefore, any effort to remove by a subsequently served defendant after that period 'would be futile, because the first-served defendant would be unable to join that petition and the case therefore would be unremovable.'" *Auchinleck v. Town of LaGrange, 167 F. Supp. 2d 1066, 1068 (E.D. Wis. 2001)* (quoting *Phoenix Container, L.P., 83 F. Supp. 2d at 932*). [*24] *See also Graft v. Alcoa, 2003 U.S. Dist. LEXIS 7168, No. 1:02-CV-01848-JDT-TA, 2003 WL 1984347, at **4-5 (S.D. Ind. Apr. 4, 2003)*.

Where the requirement of unanimity is eliminated, so too is the first-served defendant rule. *See Plourde v. Ferguson, 519 F. Supp. 14, 16 (D. Md. 1980)* (removal pursuant to *28 U.S.C. § 1442*, governing removal by federal officers, was timely where a defendant properly removed the case within thirty days of receipt of the initial pleading in the case, notwithstanding the fact that an earlier-served defendant failed to effect timely removal; *section 1442* does not require unanimity of parties to effect removal). Thus, because the CAFA eliminates the requirement of unanimity, presumably it eliminates the first-served defendant rule as well, so that 360Networks (USA), Inc., was entitled to, and did, remove this case within thirty days from the date the company became a party Defendant. [7]

> 7 Also, the Court notes that recent decisions of the United States Court of Appeals for the Seventh Circuit have somewhat ambiguously adopted the "last-served defendant" rule, which provides that in cases involving multiple defendants served at different times, each later-served defendant has thirty days from the date of service to remove a case to federal court, with the consent of the remaining defendants. *See Midlock v. Apple Vacations W., Inc., 406 F.3d 453, 455 (7th Cir. 2005)*; *Boyd, 366 F.3d at 530* (citing *Marano Enters. of Kan.v. Z-Teca Rests., L.P., 254 F.3d 753, 757 (8th Cir. 2001)*). *See also Chlopek v. Federal Ins. Co., 2005 U.S. Dist. LEXIS 28471, No. 05-C-545-S, 2005 WL 3088355, at *2 (W.D. Wis. Nov. 17, 2005)*.

## [*25] CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Remand (Doc. 24) is **DENIED.** As per the Court's Order

entered February 27, 2006 (Doc. 20), granting Plaintiffs' Motion for Enlargement of Time to Respond to Defendant's Motion to Dismiss and Set Aside Order of Default and Memorandum in Support (Doc. 19), Plaintiffs are **ORDERED** to file a response to the Motion to Dismiss and to Set Aside Order of Default and Memorandum in Support brought by Defendant 360Networks (USA), Inc.

(Doc. 16), within **ten (10) days** from the date of entry of this Memorandum and Order.

**IT IS SO ORDERED.**

DATED: 05/18/06

s/ G. Patrick Murphy

Chief United States District Judge